FEE PAID



UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

## LACV1902011-DSF-RADx

| | | |
|---|---|---|
| DR. JEFFREY ISAACS | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| vs. | ) | |
| | ) | |
| DARTMOUTH HITCHCOCK MEDICAL CENTER, | ) | |
| GEISEL SCHOOL OF MEDICINE AT DARTMOUTH, | ) | |
| USC KECK SCHOOL OF MEDICINE, | ) | |
| NH BOARD OF MEDICINE (individually) | ) | |
| and | ) | |
| JOHN or JANE DOE | ) | |
| Defendants. | ) | |
| | ) | |

```
RECEIVED
CLERK, U.S. DISTRICT COURT

MAR 13 2019

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY
```

## PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

### I.    INTRODUCTION

1. This case describes a small group of individuals with a nexus as academic medicine leaders from Harvard Medical School, who, owing to a personal vendetta, coordinated predicate acts over more than a decade to successfully ruin the Plaintiff's medical career and reputation.

2. In their small world controlling billion dollar NIH grants and coveted Ivy league medical school spots, they successfully recruited new actors each time Plaintiff went to a new institution where they had influence. They subverted institutional policies and generally pulled strings, as evidence will show, without having to answer to anyone for years, until, upon information and belief, the Executive Branch began to ask questions.

3. Specifically, this matter originated with a dispute dating back to 2005, between Plaintiff, a promising young medical student, and one Robert Baughman, a former NIH director,

Harvard professor, and member of the White House Committee on Counterterrorism. Baughman had overseen a substantial $40 million dollar grant to the Keck School of Medicine, where his child was subsequently accepted with Dr. Isaacs into the MD Class of 2009. A dispute arose between Isaacs and the younger Baughman, and the school was alleged to have improperly yielded to the NIH donor, when they severely disciplined the Plaintiff. After protracted litigation in this District, a settlement agreement was reached that sealed all disciplinary records, dismissed all administrative charges, and cancelled all contracts between the parties. Years went by; Isaacs excelled without further incident at international medical school with training in London, Singapore, and New York and Florida, and achieved a top decile national board score higher than the average neurosurgeon.

4. His achievement and persistence fueled an organized and relentless retaliation against him that continues to the present day. With his newly achieved medical diploma, Dr. Isaacs began residency training at Dartmouth. Knowledge of the sealed USC controversy, through John Doe, reached Dartmouth's medical school some five years after it began. John Doe's identity has been never been revealed by the Defendants and the Defendants have taken steps to conceal his or her identity. Motivated by John Doe's influence, Isaacs's arrival at Dartmouth was met with the strongest resistance. He was treated unethically and suffered extraordinary stress. Representative of the actions intended to break him down, he was ordered to conduct two unnecessary prostate exams his first two days of residency. Dartmouth terminated Isaacs without the normal peer review hearing process required by hospital bylaws.

5. Former Dartmouth & World Bank President Jim Yong Kim was notified to preserve evidence for federal court review of the circumstances. Within a week, Dr. Isaacs' emails and medical records at Dartmouth completely disappeared. Ultimately, the corruption extended from high academia to government officials. Dartmouth sent the sealed Keck records to the New Hampshire Board of Medicine. The Board, in turn, published the false, sealed records on the internet, declaring them to have never been sealed.

6. Such activity precisely captures why Congress enacted the RICO Act – to prevent and expose the infiltration of legitimate institutions by corrupt individuals. To be sure, each institution named in this lawsuit is an otherwise venerable institution where the Plaintiff did, and does, seek to resume his medical research career. The Defendants executed constant, longstanding, and corrupt schemes intended to deprive Plaintiff of his medical career. Indeed, Plaintiff's fourteen year saga to practice medicine is unheard of for a physician with his top academic ranking and no other bar to employment.

7. As a jury shall determine, Defendants willfully violated RICO statutes over a fourteen year period by recruiting new individuals to carry out an orchestrated pattern of retaliations, due process violations, and judicial obstructions meant to prevent Dr  Isaacs from ever becoming a doctor.

## II.    JURISDICTION AND VENUE

12. Venue in the California Southern District is proper because the dispute transpired and originated in the district. Additionally, the settlement agreement and disclosures by John or Jane Doe, central to this case, necessarily stemmed from this district. The Plaintiff was retaliated against, for fourteen years, because he was a witness in an official proceeding in this district.

13. Jurisdiction in this Court arises under 28 U.S.C. § 1331, for federal questions presented pursuant to 18 U.S.C. § 1965 (RICO). Jurisdiction for injunctive and other causes of action is invoked pursuant to 28 U.S.C. § 1332.

### III.   PARTIES

14. Plaintiff Dr. Jeffrey Isaacs is a citizen of the Commonwealth of Pennsylvania. Dr. Isaacs holds an A.B. from Dartmouth College, an MBA from Wharton/Insead, and an M.D. issued in 2010 from the American University of the Caribbean. He began medical training with Defendant Keck in 2005. Fourteen years after federal controversy commenced, the Defendants continue to improperly prevent him from obtaining necessary federally funded residency (GME) training for medical licensure.

15. Defendant New Hampshire Board of Medicine is a group of individuals who convene at 121 South Fruit Street, Suite 301, Concord, NH 03301-2412 under the color of New Hampshire state law. The individuals, specifically, include prosecutor and investigator Jeff Cahill, administrator Penny Taylor, and the voting members of the Board. The individuals shall be considered to be enumerated defendants in the caption of this lawsuit, and shall be served and noticed in accordance with local and FRCP.

16. Defendant Dartmouth Hitchcock Medical Center is a non-profit corporation with a principal address of One Medical Center Drive, Lebanon, NH 03756. Defendant Dartmouth Hitchcock Medical Center does not have a registered agent in the State of New Hampshire. Plaintiff was a salaried employee of Mary Hitchcock Memorial Hospital, related to DHMC, but was a student trainee of Dartmouth College.

17. Defendant Geisel School of Medicine is a DBA for Trustees of Dartmouth College which has a principal office address at 63 South Main Street, Ste. 301, Hanover, NH 03755 and

no registered agent. According to its webpage, the Board of Trustees "has ultimate responsibility for the financial, administrative and academic affairs of [Dartmouth] College.' Plaintiff's applications to study GME have been declined as recently as November 2018 by faculty employed by or associated with the College.

18. Defendant USC Keck School of Medicine ("Keck") is located at 1975 Zonal Avenue in Los Angeles, in the Southern California District. In 2008, Plaintiff and Keck settled a lawsuit in this district, CV-06-3338-GAF. This complaint alleges witness retaliation to present day for disclosure of federal violations in said settled litigation.

19. Information about John and/or Jane Doe will be amended when available.

### IV.    FACTUAL HISTORY

20. In August 2005, the Plaintiff matriculated into the Class of 2009 M.D. program at the Keck School of Medicine at University of Southern California.

21. During the first semester, a relationship with a fellow Keck Classmate, one A.B., turned sour. A.B. made threatening statements to the Plaintiff, such as "I got into Keck through my connections, I'll get a residency through my connections, don't mess with me." [1]

22. At the time, email return receipt technology was new and developing. An electronic message Plaintiff had sent to A.B. started registering return receipts at NIH headquarters and the Zilkha Neuroscience Center Executive Office at Keck.

23. Shortly thereafter, USC Security served Plaintiff with a "stay-away" order from classmate A.B.

---

[1] Indeed, A.B. has attained faculty appointment at Harvard Medical School, while Plaintiff – with his higher merit scores – has spent well over a decade trying to correct the wrongs inflicted by the Defendants.

24. At the suggestion of the Keck Administration, A.B. sought to press charges with the LAPD for a paragraph of electronic written messages, sent by the Plaintiff, which she purported to be insulting. The LAPD, however, declined to press charges related to the petty dispute.

25. At the time, Plaintiff alleged the "stay-away" order was being used to embarrass him amongst his classmates. Plaintiff had difficulty complying with said order given that there were only three lecture rooms used by the one hundred members of the Class of 2009 M. D. program.

26. As evidenced by the return receipts, in conjunction with A.B.'s statement concerning connections, Plaintiff realized A.B.s father, head of Neurological NIH, was communicating with Keck's new Dean, Brian Henderson, who had recently been promoted after securing millions in funding for the new Zilkha Neuroscience Center.

27. Plaintiff's academic performance began to deteriorate because of the distraction created by the stay away order. He telephoned A.B. and offered his apology for his role in the aforementioned dispute, hoping to de-escalate the situation. A.B. initially accepted the apology.

28. However, the Junior Keck Dean, Peter Katsufrakis, brought Plaintiff before the Keck Student Performance Committee, and expelled him for apologizing to A.B. while the stay-away order was under effect.

29. Plaintiff was hospitalized with what appears to have been an Adjustment Disorder, stemming from the trauma of being expelled.

30. Plaintiff filed a federal lawsuit, CV-06-3338-GAF, against Keck, Henderson, Katsufrakis, and A.B's father.

31. For unknown reasons, in 2006 Deans Henderson and Katsufrakis left their Deanship posts at Keck. Additionally, A.Bs father left the NIH to move to Okinawa, Japan.

32. After two years of alleged discovery evasion taking advantage of Isaacs' *pro se* status, Keck finally agreed to settle the claims with Isaacs.

33. Dr. Isaacs executed the first settlement agreement with the University of Southern California in 2007. AR 000032 (See Attached). That settlement dismissed the individual defendants from the suit, including the USC Dean and a National Institutes of Health official. Paragraph 2 of that Agreement was entitled "Sealing of Disciplinary Records," and read:

> "In exchange for the Dismissal with Prejudice of the Individual Defendants, referenced above, Defendant USC agrees that commencing immediately upon the execution of this Settlement Agreement and receipt of the signed Dismissal with Prejudice, *USC will not release or disclose Isaacs' disciplinary records to any third party*, including but limited to other educational institutions and/or potential employers, unless it receives written consent from Isaacs or a subpoena or court order."

34. The only consideration Isaacs received for dismissing his case under the first settlement agreement was the sealing of his disciplinary records.

35. The intent of the settlement was to allow Isaacs, who was already well in his second year of medical school at AUC, to move on and continue his career in medicine.

36. A second settlement agreement between USC and Dr. Isaacs ended the litigation with that institution. AR 000031 (See Exhibit). The excerpted paragraph 8 of that agreement stated that, "[a]s a material inducement to Isaacs to enter into this Agreement, USC does

hereby irrevocably release, acquit and forever discharge Isaacs from any and all charges .
. . obligations, promises, agreements . . . of any nature whatsoever, known or unknown . .
." *Id.*

37. This settlement agreement further dismissed any outstanding administrative charges against Dr. Isaacs.  AR 000462 (See Attached).

38. Based primarily on the quoted language of the two settlement agreements and the advice of his attorney at the time, Dr. Isaacs understood that anything relating to his attendance at Keck was sealed and could not be disclosed by anyone, *including Dr. Isaacs.*

39. There are very few cases of sealed disciplinary academic records, and little legal precedent as to how they should be handled by the courts.

40. Here, the authoritative federal statutory regulation is 20 U.S. Code § 1232g - Family educational and privacy rights.

41. Specifically, the provision dealing with disciplinary records is instructive:

(h)Disciplinary records; disclosure

Nothing in this section shall prohibit an educational agency or institution from—

(1) including     appropriate     information     in     the     education record of any student concerning disciplinary action taken against such student for conduct that posed a significant risk to the safety or well-being of that student, other students, or other members of the school community; or (2) disclosing such information to teachers and  school  officials,  including teachers and  school  officials  in  other schools, who have legitimate educational interests in the behavior of the student. (i) Drug and alcohol violation disclosures

42. In simple terms, FERPA and other routine liability laws normally would grant Keck an absolute right and duty to disclose a student's disciplinary records to another university with a vested interest.

43. By "sealing" the disciplinary records so that future disclosure would be prohibited, and hence outside the realm of FERPA, Keck expunged Isaacs' student record.

44. If they hadn't intended to expunge those records with these settlement agreements, Keck would be in violation of FERPA and other routine liability laws by failing to report the discipline to an educational institute with an interest in knowing.

45. With the knowledge that the settlement agreements placed his issues at Keck behind him, Isaacs proceeded in an international medical program, and finished ahead of schedule in 3 ½ years without incident.

46. His medical training included clerkship training at St. George's University London, Cleveland Clinic and Mt. Sinai School of Medicine (NY). Dr. Isaacs received strong reviews, mostly honors, from supervising professors at more than twelve different clerkships at the aforementioned institutions.

47. Dr. Isaacs received his medical degree in 2010 after he placed in the top decile on the highly competitive United States Medical Licensure Exam Step 1.

48. In July 2011, Isaacs was admitted to a federally funded Graduate Medical Education program ("medical residency") at Dartmouth Medical School, and their associated teaching hospital, DHMC/Hitchcock.

49. Within days of arriving at Dartmouth, Isaacs's health took an immediate and substantial turn for the worse. Previously able to work thirty hour surgery shifts, suddenly Isaacs had difficulty staying awake for more than three hours at a time.

50. Isaacs additionally had new chest palpitations and shortness of breath which persisted even upon returning home from work.

51. Another resident, who Isaacs has never met to this day, sent a complaint to Dartmouth's Internal Medicine Program Director, Harley Friedman, asserting she heard about Isaacs' mistreatment and felt his supervisor, Dr. Khagi, should be replaced.

52. Dr. Friedman wrote back to the complainant, dismissing her concern, and coercing her to turn on Isaacs. This evidences the beginning of Dartmouth's involvement in a longstanding pattern of predicate acts, by recruiting others individuals at Dartmouth to violate and suppress Isaacs's rights as a student physician.

53. Dr. Khagi ordered Isaacs to conduct two digital rectal exams (DREs) during his first 2-3 days of residency.

54. The exams were unnecessary for medical treatment. One patient had terminal metastatic cancer, and to this day, Isaacs recalls the patient's shock when he was informed he needed a prostate exam to look for a "cancer source" per Dr. Khagi's instruction.

55. The exams were not for medical training.

56. The exams were meant to humiliate Isaacs for his past at Keck.

57. A plethora of other false situations were created for Isaacs. He was often left in silence as his supervisors watched him not knowing what to do in a new hospital, and purposefully failed to instruct him.

58. Dartmouth accepted federal funds to train Isaacs.

59. Their schemes to humiliate Isaacs denied him any semblance of reasonable training. As such, Dartmouth benefitted inappropriately from receipt of federal funds.

60. At least six Dartmouth administrators, under oath in federal depositions, falsely stated they learned of Keck at the end of Isaacs' six months of internship employment, no earlier than January 2012. (See Exhibit).

61. These administrators committed perjury in order to further the enterprise of revenging Isaacs, assassinating his reputation, and ending his medical career. Had Dartmouth admitted they possessed knowledge of the sealed Keck records in June 2011, it would support the timeline alleged by Isaacs' claims of mistreatment. Thus, they had to submit perjured testimony that they only learned about Keck in January 2012.

62. In fact, in early November 2011, Harley Friedman interviewed Isaacs's replacement from his same Caribbean medical program, one Jeremy Whyman MD. Until then, Dartmouth had never accepted a student from the Caribbean.

63. Upon information and belief, no later than November 2011, Dartmouth sought Isaacs' medical records from Keck, the Caribbean, and other places he had studied.

64. Dartmouth directly communicated with the schools Isaacs had previously attended.

65. Dartmouth even emailed Isaacs' Wharton MBA program subsidiary in France to obtain records.

66. Dartmouth was obtaining these records to research the information they had from John Doe concerning Keck.

67. Upon information and belief, at the time Dartmouth attempted to verify the situation with, but Keck refused to release the expunged disciplinary records to Dartmouth.

68. Dartmouth was left with a dilemma of both having information about the sealed records, causing the ongoing situation of widespread mistreatment of Isaacs at his internship, and their knowledge in fact that their sealed legal status was improper to use against Isaacs. In

short, the dilemma escalated over six months with Dartmouth unable to handle the situation in any ethical or legal fashion.

69. Dartmouth refuses to answer, despite years of discovery requests, how and when exactly they had learned that Dr. Isaacs attended Keck.

70. Around Thanksgiving 2011, one Jeffrey Simon MD told Plaintiff "I don't know what you did in your past, but you're right, they're trying to get rid of you."

71. On October 12, 2011, Dr. Isaacs completed an actigraph study with Dartmouth's Sleep Medicine program to address his inability to stay awake. The results of this study were that Dr. Isaacs was unable to stay awake for more than 3 hours at work due to hazing and mistreatment.

72. The results of this actigraph study would later disappear under questionable circumstances.

73. Dartmouth violated numerous state and federal medical records and patient rights regulations when they intentionally deleted his sleep study. RICO is one of the laws violated by this instance of medical records deletion.

74. The Plaintiff became aware of the illegal situation in early January 2012, and informed Dartmouth that there would be a Federal lawsuit filed and that all evidence should be preserved.

75. Plaintiff made this request through an email letter to College President Jim Yong Kim, notifying him of pending litigation in the United States District Court. The email specifically indicated that all ESI evidence should be preserved.

76. The college had a duty under Federal Law to preserve relevant evidence and was noticed of this duty no later than January 15, 2012.

77. Despite that notice, the Plaintiff's computer and email accounts with Dartmouth Hitchcock Medical Center were disabled on January 17, 2011 and scheduled for deletion.

78. Isaacs noticed his account login was disabled and telephoned DHMC IT support on or around January 17, 2011.

79. IT support told Isaacs that his supervisors ordered the deletion of his electronic accounts.

80. IT support further informed Isaacs that automatic safety mechanisms were preventing the deletion for approximately another week.

81. Isaacs desperately emailed Finn, Jim Yong Kim, and others, pleading to reverse their order to destroy his electronic login and email access.

82. Finn was aware of Isaacs' litigation notice to Jim Yong Kim at the time she ordered deletion of Isaacs' electronic (eDH) files. (See Exhibit).

83. Finn had referenced the litigation and complaints to Jim Yong Kim in emails she sent to others in her department on or around January 15, 2012.

84. Finn and Kim, with coordination from Dartmouth attorneys, formed a consortium that worked to commit felonious evidence destruction.

85. There can be no doubt, *res ipsa loquitor*, that Finn and Jim Yong Kim purposefully and intentionally ignored Isaacs' pleas not to delete his eDH accounts.

86. Normally, an eDH account would only be deleted after an employee is properly terminated through due process including a fair hearing. As such, this email destruction occurred at least two months earlier than it should have.

87. The willful destruction of Isaacs' eDH accounts constitutes a felony under United States Code. 18 U.S.C 1519.

88. Dartmouth, via its attorneys, would later argue to the Court that automatic processes caused the destruction of Isaacs' eDH accounts.

89. Dartmouth knew that the felony code has exemptions for ESI deletions caused by automatic processes.

90. As stated, the only relevant automatic processes in this case were safety mechanisms to prevent the deletion of the ESI.

91. No automatic process caused the deletion of Isaacs' eDH ESI.

92. Finn and Jim Yong Kim's decision to delete Isaacs' eDH files caused the deletion.

93. Dartmouth, via statements made by their attorneys, defrauded the Court by suggesting automatic processes were to blame.

94. The deletion of Dr. Isaacs' electronic accounts severely limited his ability to support his well-founded claims in the District Court and in administrative proceedings.

95. Dartmouth used fraudulent means and information to prevent the further discovery and prosecution of their felonious email destruction. As a result, legal determinations based upon said fraudulent means are invalid.

96. Dartmouth terminated Isaacs in March 2012, without having ever placed him on formal probation.

97. Probation is a due process guaranteed by various contractual and accreditation guidelines applicable to Isaacs' residency at Dartmouth.

98. Defendant Finn and Kim sought to deny Isaacs this right.

99. Dartmouth terminated Isaacs in March 2012, without having ever allowing him a "Fair Hearing" amongst Dartmouth peer physicians.

100.    "Fair Hearing" is a due process guaranteed by various contractual and accreditation guidelines applicable to Isaacs' residency at Dartmouth.

101.    Defendant Finn and Kim sought to deny Isaacs this right.

102.    Dartmouth terminated Isaacs by sending him a letter via US Mail, falsely accusing him of concealing his Keck records, and falsely accusing him of not disclosing other records from Arizona.

103.    Dartmouth knew the Keck records in fact had been expunged. Dartmouth had an absolute, unfettered right via FERPA to confirm or deny the expungement of the Keck records.

104.    As such, Dartmouth's letter via US Mail constitutes Mail Fraud under the United States Code.

105.    At least one civil federal lawsuit was concluded adversely to Plaintiff, as a result of Dartmouth defendants submitting knowingly false and fraudulent information to the court.

106.    One such case was in the New Hampshire district, lawsuit CV-12-40-LM.

107.    That lawsuit alleged that Plaintiff had become disabled from mistreatment at Dartmouth. The lawsuit concluded (with missing emails and medical records) when Plaintiff's request to obtain spoliated evidence was ignored by the court, which entered summary judgment. As such, a summary judgment was entered in Dartmouth's favor, stating they did not violate the ADA by not accommodating Isaacs disability (which was alleged to have been caused by Dartmouth itself).

108.     Nothing in the summary judgment declared that Isaacs was permanently barred from practicing medicine, nor that his future applications to Dartmouth shouldn't be given all due consideration.

109.     Indeed, uncontested witness statements in that lawsuit's record included senior program directors' statements that "Isaacs medical knowledge was perfectly acceptable," and that "most of his reviews were quite positive." In fact, there were only several specific performance faults attributed to Isaacs in the record of cv-12-40, and they themselves are alleged to have been issued in mockery. They are 1) that he forgot a pager at lunch, and 2) that he forgot to listen to a patient with a stethoscope.

110.     In one deposition in cv-12-40, Dr Christine Finn testified that she would "defer to the AAMC" and other competent authorities, with regards to interpretation of the Keck settlements.

111.     The NHES, New Hampshire Employment tribunal, is a competent authority. The NHES determined that Isaacs non-disclosure of Keck records was permissible, because he believed it to have been expunged.

112.     Similarly, the AAMC closed an investigation, in Isaacs' favor, upon legal review of the Keck settlements.

113.     In short, Dartmouth and the NH Board of Medicine (see below) defied two prior competent authorities, when they faulted Isaacs for non-disclosure of Keck.

114.     Under an applicable standard of willful falsification and gross misrepresentation, Dartmouth and the NH Board incorrectly faulted Isaacs for interpreting the Keck settlement agreements the same way as the AAMC and NHES.

*115.*      In other words, they continue to accuse Isaacs of dishonesty for *simply believing the legal interpretations of the AAMC and NHES (and numerous other attorneys) were possible.*

116.      In sum, at the conclusion of cv-12-40, Isaacs believed that despite the setback at Dartmouth, he still had a future medical career. This would especially be the case if his medical conditions, caused by Dartmouth, improved.

117.      Commonly, resident physicians who suffer medical ailments forcing them to abandon a medical residency, are then permitted to return to federal GME training after being rehabilitation.

118.      Hence after cv-12-40's MSJ, there existed no reason Isaacs could not hope and expect he would at some point be able to return.

119.      However, years of applications to Dartmouth and appeals of the NH Board false orders (see below) have made it apparent that the Defendants have succeeded in permanently barring Isaacs from residency and licensure.

120.      It is exceptionally rare, if not unheard of, for someone with Isaacs credentials, and no criminal record or other bar to employment, to be kept out of training for seven years.

121.      Indeed, Dartmouth didn't even acknowledge receipt of Isaacs most recent application to GME in September, 2018. Such treatment is now obvious to be consistent with Dartmouth's vendetta against Isaacs ever becoming a doctor.

122.      Dartmouth has even pleaded several times, in related lawsuits, that Isaacs cannot "resuscitate claims against Dartmouth by reapplying each year."

123.      Such a statement means that Dartmouth does not welcome Isaacs' 2018 application to their federally funded program.

124.     Such a statement means that Dartmouth believes Isaacs should be permanently barred from GME medical training at their facility.

125.     Such a statement means that Dartmouth believes that an improvement in the medical situation that caused him to leave 2011 residency would never warrant consideration of a reapplication.

126.     Such a statement means that Dartmouth continues to accuse Isaacs of guilt for interpreting the Keck settlement agreements in the same fashion as NHES and AAMC.

127.     Such a statement is in fact evidence that Dartmouth's official stance is one of permanent, illegal retaliation against Isaacs, in violation of federal witness retaliation laws.

128.     Such a statement evidences the overall scheme, and simplest explanation: that Isaacs has been subject to longstanding, repetitive and deliberate violations of RICO, owing to a vendetta  by some of the highest members of academic medicine, the Defendants. *The Defendants lawyers in fact have plainly issued a statement that Isaacs should never reapply to federal GME programs because he sued them, multiple times, and obtained valid settlement expungements.*

129.     In 2014, no less than three Dartmouth officials testified under oath that the unnecessary DREs had never been investigated.

130.     In 2017-2018, Dartmouth made numerous, false assertions to dismiss a civil Title IX claim. Amongst these false assertions, Dartmouth refuted the Title IX claims as false, despite the well known fact they had never been investigated.

131.     Dartmouth's pattern of perjury and false pleading statements goes well beyond defense "lawyering" and, in and of itself, represents obstruction of justice.

132.    Dartmouth similarly caused a false letter to be sent to the New Hampshire Board, transmitted false/expunged records from Keck.

133.    Dartmouth's materially false letter to the NH Board, disguised as FERPA-proper educational records, constitutes Mail Fraud under United States Code. Dartmouth knew Keck was not releasing the sealed discipline history, but mislead the NH Board of Medicine to believe otherwise.

134.    The NH Board received the Keck information and immediately assigned the matter to Defendant Cahill. Cahill, in 2013, telephoned Isaacs and said "Just so you are aware, this was placed on my desk from someone above. I don't want to make a mountain out of a molehill."

135.    Dartmouth had recruited individuals at the NH Board to scheme and defraud, and retaliate against, Isaacs.

136.    Cahill made no less than six attempts, over two years, to coerce Isaacs to settle. In one email, he even said "I don't think this will affect your lawsuit with Dartmouth," but that he "needed" Isaacs to admit wrongdoing via Keck.

137.    The New Hampshire Board of Medicine (the "Board") found that Dr. Isaacs had improperly failed to disclose his "criminal stalking" and Keck enrollment on his residency application. AR 000042; AR 000022-30.

138.    Setting aside its incorrect claim that Dr. Isaacs had a criminal record, which he did/does not, the Board not only rejected Dr. Isaacs' reliance on the settlement agreements but also disclosed the facts of the Keck circumstances contained in documents that the agreements had sealed. AR 000022-30.

139.     In so doing, the Board violated the court-entered settlement agreements and, worse, forever tarnished Dr. Isaacs' reputation.

140.     The Board withheld critical exonerating evidence from the public, namely, the first Keck settlement agreement.

141.     The Board falsely stated to the public that "there is no provision sealing the records."

142.     The Board also declared that, upon information and belief, USC failed to complete their end of the settlement agreement, specifically, they failed to release any outstanding administrative charges. Releasing outstanding administrative charges was one of the plain-text requirements of the second Keck settlement agreement.

143.     If true, Defendant USC's failure to release administrative charges against Isaacs represents an additional predicate act of obstruction of justice and/or due process violations.

144.     Counterintuitively, the Board blamed Isaacs for USC's failure to release administrative charges, despite conceding that USC had breached their contractual duty.

145.     Such an argument goes beyond mere error, and represents Cahill and the Board's ongoing attempt to participate in the predicate acts and scapegoat Isaacs. The Board order itself evidences a *mens rea* to join and please the high academia enterprise begun all those years ago by the Defendants.

146.     Given Cahill's statements, and two year timeframe scrutinizing the record, the evidence shows his intention to obstruct justice and due process by issuing false statements and withholding key evidence from a state proceeding.

147.     To date, the Board's only defense, argued in recent federal court motions, is that there was "no clearly established right" for Cahill to include the Keck settlement exonerating evidence in his order. In other words, the Board doesn't contest their Order is false. They merely contest that Isaacs had any right to a true Order, or an order that took into consideration favorable to Isaacs.

148.     Further evidencing their corrupt involvement pursuant to RICO, the Board failed to investigate Khagi for the unnecessary DREs he ordered. Plaintiff sent repeat requests for investigation, over a two year period, which were ignored.

149.     By failing to investigate any of Isaacs' claims, and issuing knowingly false documents against him, the NH Board, via its officers, repeatedly obstructed justice and denied Plaintiff due process, in the act of joining the co-Defendants efforts to end Isaacs' medical career.

150.     In mid-2014, the Board first published the above false orders on the internet, and national medical board sanction action databases/clearinghouses.

151.     The Board continues to publish these documents in late 2018. The Board is aware they contain materially false and damaging information.

152.     As a result of false declarations of "stalking crimes," the years following 2014 publication, Isaacs became further ostracized from former colleagues, friends, neighbors, and even had AirBNB reservations cancelled.

153.     Despite being reasonably optimistic that justice would prevail in a timely fashion, over time, Isaacs had to reasonably conclude that the actions of the Board and other Defendants permanently ended his medical career and caused severe reputational harm.

154.     It would be unrealistic and unfair to have expected Isaacs to have fully realized this injury in 2014, at the first instance of publication of a related order. Indeed, Isaacs never reasonably anticipated an appeals process where the Board would admit their Order was false, but not retract it.

155.     Reputational and career harm of this magnitude are extraordinary and took months to years to fully process and understand the implications thereof.

156.     Isaacs has applied to Dartmouth's residency program for each year inclusive, 2013, 2014, 2015, 2016, 2017, 2018, and 2019. As previously discussed, only recently in 2017 did Isaacs learn that Dartmouth did not welcome further applications and any attempt to "resuscitate" his medical career.

157.     Dartmouth's own Dr Friedman and Dr West testified that Isaacs had "good" medical knowledge and was a good resident, respectively.

158.     However, the co-Defendants wish to permanently prevent Isaacs from ever being a practicing physician.

159.     As such, they have not considered seven separate residency applications over seven years.

160.     Each residency refusal is an illegal retaliation under 18 U.S.C. § 1513, and/or other anti-retaliation laws.

161.     Likewise, each and every adverse event referenced above is an illegal retaliation, deprivation of due process, and or obstruction of justice intended to thwart a 2007 federal court ordered settlement agreement, a 2012 New Hampshire United States District lawsuit, or other related processes and appeals.

162.    Plaintiff has diligently sought to uncover the predicate acts via federal discovery that began in January 2012.

163.    RICO has both civil and criminal causes of actions.

164.    Plaintiff seeks both civil and criminal prosecution of the herein described RICO violations.

165.    Plaintiff has properly noticed the Department of Justice of these civil and criminal RICO claims.

166.    Jim Yong Kim offered his resignation from his appointment as President of the World Bank, upon information and belief, after the Executive Branch raised questions pertaining to the RICO violations detailed herein.

167.    Because Defendants employed fraudulent means to spoliate evidence and offer false testimony, res judicata and double jeopardy rules do not apply in this instance.

168.    Defendants, to the best of Plaintiff's knowledge, have never been subject to criminal prosecution for the alleged offenses, under RICO or any other statute.

169.    The Defendants enacted schemes to fraudulently conceal the discovery of their illicit acts.

170.    Specifically, the Defendants destroyed email evidence, destroyed medical records, perjured themselves in depositions, and reached out to local government officials with whom they had influence, including, but not limited to , the NH Board of Medicine and the NH USDC.

171.    Similarly, the NH Board of Medicine only recently declared that despite Cahill's clear error in withholding the first settlement agreement, they would not correct the

record because there was no "clearly established right" for Plaintiff to have due process and a true public board order.

172. As a result of the aforementioned fraudulent concealment, and lengthy delays in the previous related lawsuits, the full nature of Plaintiff's injuries have been difficult to precisely ascertain.

173. A jury shall determine that Dr Isaacs' currently cannot practice medicine as a result of a pattern of illegal, retaliatory behaviors initiated by John Doe in connection with the Keck, spanning over fourteen years, ultimately involving Dartmouth and the NH Board officers.

## V.    CAUSES OF ACTION

### COUNT I
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO)
### 18 U.S.C. § 1962(c)
### (All Defendants)

174. Plaintiff repeats and re-alleges each and every allegation contained herein as if fully stated under this count.

175. RICO's reach is broad and includes otherwise law-abiding businesses and persons who violate its provisions. (*Sedima, S.P.R.L.* v. *Imrex Co., supra,* 473 U.S. at pp. 499-500 [87 L.Ed.2d at pp. 360-361]; *Cianci* v. *Superior Court, supra,* 40 Cal.3d at pp. 908-909.) Gerase v. Superior Court, 31 Cal. App. 4th 1218, 1229 (CA 3rd 1995).

176. As defined by RICO, the Defendants formed an enterprise under at least one of several parallel, non-exclusive theories. First, the Defendants all participated in, and made a living from, federally and state funded medical training activities. Second, the Defendants all had a reputational and commercial stake in the national health care provider network. Third, all Defendants had some stake in, or authority over, Plaintiff's

medical and/or professional career. Fourth, all Defendants had authoritative control and or publishing rights in nationwide medical training databases, including board licensure & reprimand databases which now contain false, retaliatory information. Fifth, all Defendants directly had some nexus as Harvard Medical School faculty, alumni, and/or social and professional or interests in affiliated academic medicine posts such as those at Dartmouth and Keck. Finally, the Defendants formed a *de facto* enterprise with the sole purpose of carrying out a vendetta and negatively impacting Dr. Isaacs's medical-professional career. Per <u>United States v. Turkette</u>, 452 U.S. 576, 583 (1981), where the court upheld a RICO conviction even though the only purpose of the enterprise was to engage in a pattern of racketeering activity.

177.    The Count I Defendant(s) have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through a pattern of racketeering and activity described herein, in violation of 18 U.S.C. § 1962(c).

178.    The Defendants committed numerous predicate acts, spanning no less than twelve years, which constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

179.    Representative predicate acts are enumerated below for each defendant. This list is not exhaustive and shall be refined during discovery. Predicate acts have also been pleaded earlier in this complaint.

180.    The predicate acts described in this complaint all violate one or more of the following federal statutes:

      a.   18 U.S.C. § 1513 (hereafter "witness retaliation"), which forbids conduct that "damages the tangible property of another person, or threatens to do so, with intent to retaliate against any person for--   the attendance of a witness or party at

an official proceeding, or any testimony given or any record, document, or other object produced by a witness in an official proceeding; or, Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, …Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, shall be fined under this title or imprisoned not more than 10 years, or both."

b.   18 U.S.C. § 1503, (hereafter "obstruction of justice"), which forbids obstruction of process, generally, including actions taken "corruptly" to "influence, obstruct, or impede the due administration of justice."

c.   18 U.S.C. § 1512, (hereafter "witness tampering"), Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to— influence, delay, or prevent the testimony of any person in an official proceeding (2)cause or induce any person to—withhold testimony, or withhold a record, document, or other object, from an official proceeding; alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding; evade legal process summoning that person to appear as

a witness, or to produce a record, document, or other object, in an official proceeding;

d. 18 U.S.C. § 1343, (hereafter "wire fraud"), forbids any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice. Per statute, this shall include any scheme to deprive another of honest services.

e. 18 U.S.C. § 1341, (hereafter "mail fraud"), forbids any scheme or artifice to defraud .. by means of false or fraudulent pretenses, representations, or promises … for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service.

## I.   <u>Dartmouth Defendants/ Jim Yong Kim</u>

181.    The factual history describes a pattern of adverse actions taken by Dartmouth and Jim Yong Kim meant to interfere with Plaintiff's livelihood and property. Predicate acts began as soon as Isaacs arrived at Dartmouth for training in July 2011. Specifically, through the unknown communication with John or Jane Doe, Dartmouth began to retaliate against Isaacs for his complaints against Keck and the NIH. Plaintiff was, and should have been, protected from such treatment pursuant to federal witness retaliation code (see, supra). Based upon information and belief, John Doe formed a nexus and

enterprise with Dartmouth officials which jointly retaliated against Plaintiff. No later than January 2012, Isaacs had commenced federal proceedings against Dartmouth itself. Adverse actions which occurred after January 2012 violated witness tampering and obstruction of justice statutes, in addition to witness retaliation code.

182.    Representative actions violating these statutes have been described in the factual history. Such actions include, but are not limited to, ordering Isaacs to conduct unnecessary prostate exams, silencing other staff who spoke out against mistreatment, blatantly depriving Isaacs of institutional due process, and falsely accusing Isaacs of medical mistakes and errors. Each of these acts was meant to retaliate against a federal witness, and/or interfere with a proceeding, in violation of the cited statutory authority. In layman's terms, it is well known that Isaacs was, in violation of RICO, persona non grata in the academic medicine field after suing several Harvard Medical School leaders.

183.    Once Isaacs notified Dartmouth of pending federal litigation, his emails were deleted by Jim Yong Kim or Christine Finn. A warning that emails were being deleted was ignored by Jim Yong Kim. As such, Kim either assented to, or directly ordered, the email destruction. Isaacs' medical records were also destroyed during the same month in January 2012. Isaacs was denied a fair hearing later in 2012, as required by hospital bylaws. Based upon the proximate sequence of retaliatory events following Defendant Kim's receipt of a federal lawsuit notice, evidence shows he either ordered, or assented to, separate acts of email destruction, medical records destruction, and multiple internal due process violations. Dartmouth College and DHMC are legally culpable, having assented to these improper actions carried out by Kim and other administrators.

184.     Multiple instances of evidence spoliation form the basis of a pattern of predicate acts that violated federal witness tampering and obstruction of justice laws. The Dartmouth defendants took repeated steps, over an extended period of time, to destroy the written record of evidence that was be critical to litigation due process in the federal courts. Plaintiff did not receive due process in prior lawsuits and administrative processes as a direct and foreseeable result of criminal witness tampering and evidence destruction.

185.     In March 2012, a NH process server noted that Jim Yong Kim appeared to have evaded summons service by issuing false statements. Such activity constitutes a willful and deliberate pattern by Dartmouth defendants to violate federal witness tampering and obstruction of process laws.

186.     During a dozen depositions of Dartmouth physicians taken in 2012-2013, not a single witness was able to recall or describe how they learned about Plaintiff's sealed Keck records. Likewise, most witnesses outright denied, falsely, any knowledge of the sealed records. Similarly, key witnesses had no recollection of the reasons why they ordered Plaintiff to conduct the unnecessary prostate exams. Discovery will produce a detailed register of false statements made by Dartmouth defendants meant to obstruct justice and tamper with witnesses. Plaintiff has been unable to obtain correct closure of this matter as a direct and foreseeable result of Dartmouth defendants witness tampering and obstruction of justice.

187.     As part of their enterprise, Dartmouth entered false statements into interstate computer systems. For example, Dartmouth entered false reasons for termination, and false information about Keck, into interstate computer systems. During a deposition of one Natalie Riblet, Riblet challenged the authenticity of one such purported incident

entered into these databases. Such false entries constitute wire fraud, per the above referenced authority.

188.    Likewise, Finn transmitted false letters to the NH Board of Dartmouth, Isaacs, and others via US Mail. The documents contained knowingly false information about expunged falsities from Keck. These actions constituted mail fraud as per the above referenced authority.

## II.    Dartmouth New Hampshire Board of Medicine

189.    The NH Board of Medicine engaged in multiple actions in violation of federal obstruction of justice code, federal anti-retaliation code, and wire and mail fraud statutes:

190.    First, the Board refused to investigate reports of felonious sexual assault, namely, that Khagi ordered him to conduct unnecessary prostate exams, solely for the intent to humiliate Isaacs for his non-disclosure of Keck. To this day, the Board has not investigated the exams. A proper investigation would have been critical to refer the matter to appropriate authorities, and/or take Board action against Khagi and Dartmouth.

191.    The Board, specifically Jeff Cahill, withheld exonerating evidence – the Keck Settlement agreements – and revoked Isaacs medical license for non-disclosure of the annulled Keck records. They did so with intent to obstruct justice and due process in both their own hearing and related federal lawsuits. They did so to appease and work in conjunction with the enterprise that formed between them and Dartmouth; Cahill told Plaintiff by phone that he had been instructed by a superior to take on the false allegation. The Board also retaliated against Isaacs because he had named them in a PAED lawsuit in 2013. To this day, the Board falsely publishes on nationwide databases that the Keck agreements do not exist.

192. The Board even went so far as to blame Isaacs for Keck's failure to retract administrative charges, which Keck was contractually bound to do from the settlement agreements.

193. The Board went ahead with a hearing despite the fact that 8 inches of snow prevented Isaacs from attending. The Board did so with the intent of obstructing due process in both their own hearing and pending federal litigation.

194. Likewise, the Board failed to accommodate Isaacs disability request for a trial by videoconferencing, suggesting an intent to obstruct process.

195. The NH Board's only training facility is operated by Dartmouth, the only academic medical center in New Hampshire. Dartmouth has a liaison physician to the Board, and the Board consists largely of accredited physicians. As such, despite being held under the auspices of a state entity, the Board as defined as its individuals was very much involved, ultimately, in the RICO nexus described herein.

## III.   **Keck School of Medicine and John or Jane Doe**

196. Keck was the origination of the enterprise to retaliate against Dr. Isaacs as a witness of a federal crime (improper NIH influence on Keck).

197. Keck engaged in multiple predicate acts, which were the subject of a federal lawsuit in 2007. The Plaintiff settled (civil claims) against Keck via the two aforementioned settlement agreements.

198. Nonetheless, John or Jane Doe followed him, over a span of some five years, and disclosed the sealed records to Dartmouth. Based upon information and belief, John or Jane Doe necessarily must have had some connection to Defendant USC, given their knowledge of the sealed records.

199.    In any event, the New Hampshire Board of Medicine determined that USC breached the settlement agreement, as they never retracted "administrative charges" against Isaacs, including a charge of Unprofessional Conduct that lead to his suspension , and later, expulsion.

200.    As such, USC has violated anti-retaliation and wire and mail fraud provisions, with predicate acts spanning over a decade. Specifically, they continue to issue false transcript reports via wire and mail. USC has had knowledge of Plaintiff's continued legal struggles to practice medicine. USC could have easily intervened and clarified that the records had been sealed, annulled, and discharged. When they could have so easily helped conclude a decade of litigation in over a dozen venues, USC's inaction alone evidences continued intent to retaliate.

201.    These Defendants, all involved in RICO violations, progress an enterprise whose primary focus was to destroy Dr. Isaacs's career, through his mistreatment at Keck, Dartmouth and later with his mistreatment at the New Hampshire Board of Medicine and several federal courts. Generally, there is one unifying explanation for Plaintiff's fourteen year predicament: 1) in 2006, he reported activity concerning the improper NIH/Keck relationship, 2) such report included notice of federal litigation, 3) as a federal witness, and party to an official proceeding, Plaintiff should have been protected from retaliation, however 4) clearly Plaintiff has suffered an extensive retaliation that ended his medical career for being a party to said proceeding. The entire retaliation originated with an attempt to discredit him, then a promising medical student, from bringing claims against several of the most senior physicians in the nation. Forced to go "offshore," he completed his medical training and again resumed a promising path, based on his top ranking

medical school achievement and national boards. John or Jane Doe transmitted the sealed Keck records to Dartmouth, which Dartmouth does not dispute, and the predicate act pattern of revenging the perceived litigious medical student resumed.

202.     These actors are all well connected members of the medical profession and used that power in order to hide their intentions and use the courts and board of medicine in order to make sure that Dr. Isaacs can never practice medicine again. Particularly reprehensible is how Defendants, over more than a decade, used their status within venerable institutions to discredit Plaintiff and deny him any semblance of due process. Defendants planned to continue said mistreatment in perpetuity, forever denying Isaacs a medical career; it only appears questions raised by the Executive Branch finally halted Defendants' abuse of power. Punitive damages and/or substantial criminal penalties are particularly appropriate under RICO law.

203.     This behavior is particularly nefarious when one considers all of the effort it took Isaacs to pursue his singular goal of being a doctor. He worked diligently to help others as a student physician, with the understanding that his settlement agreements would protect him and allow him to move on with his life.

204.     These Defendants, through criminal enterprise, thwarted for good Dr. Isaacs's pursuit of being a medical Doctor and need to be held accountable for their crimes.

## COUNT II
## INJUNCTIVE RELIEF

Defendants shall be enjoined and restrained from interfering with Plaintiff's property, specifically, his medical licensure and right to enroll in federally funded medical training. The injunction shall also enforce the terms of the USC Keck and CADC settlement agreements.

WHEREFORE, The Plaintiff respectfully requests that this Honorable Court:

A.  Order damages in excess of $18,000,000 under the jurisdictional authority of this Court;

B.  Award triple damages, under the so-called private attorney general provisions of RICO, costs and attorneys' fees;

C.  Await the United States Attorney as a criminal prosecutor for RICO criminal violations,

D.  Permit discovery of RICO civil and criminal claims to proceed pending appointment of the AUSA;

E.  Grant any further relief as may be fair and just.

03/12/2019                                          Respectfully Submitted,


                                                    /s/ Dr. Jeffrey D. Isaacs
                                                    Dr. Jeffrey D. Isaacs, Pro se
                                                    3553 W Chester Pk #177
                                                    Newtown Square, PA 19073
                                                    Jeffreydi@gmail.com
                                                    (610) 202-1460

## CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

Jeffrey Isaacs ("Isaacs"), on the one hand, and University of Southern California ("USC"), on the other hand, have agreed to enter into this Confidential Settlement Agreement and Release (the "Agreement").

1. **Dismissal With Prejudice.**

   Isaacs agrees that he will execute and deliver for filing to counsel of record for USC, Robin D. Dal Soglio of Dal Soglio & Martens LLP, the Dismissal with Prejudice (attached hereto as Exhibit A) of Robert Baughman, Brian E. Henderson, Peter J. Katsufrakis and James M.H. Ball (together, the "Individual Defendants") from United States District Court Case No. CV-06-3338 GAF (Ex). Counsel for USC will file the Dismissal with Prejudice with the Court.

2. **Sealing of Disciplinary Records.**

   In exchange for the Dismissal with Prejudice of the Individual Defendants, referenced above, Defendant USC agrees that commencing immediately upon the execution of this Settlement Agreement and receipt of the signed Dismissal with Prejudice, USC will not release or disclose Isaacs' disciplinary records to any third party, including but not limited to other educational institutions and/or potential employers, unless it receives written consent from Isaacs or a subpoena or court order.

3. **Non-Admission of Liability.**

   This Agreement shall not in any way be construed as an admission by USC or any of the Individual Defendants that they have harassed, discriminated against or retaliated against Isaacs in any way, or otherwise acted wrongfully with respect to Isaacs. USC and the Individual Defendants specifically deny that they have any liability to or have done any wrongful acts against Isaacs.

4. **No Other or Future Lawsuits, Charges, Claims.**

   With the exception of United States District Court Case No. CV-06-3338 GAF (Ex) (the "Lawsuit"), Isaacs represents that he has not filed any other lawsuits, charges, claims for arbitration, complaints, or appeals of any kind with any court or administrative or governmental agency against the Individual Defendants or any other persons or entities released herein, and he agrees that he will not file any lawsuits, charges, complaints, or appeals at any time hereafter based on, referring to, or incorporating any events, acts or omissions through and including the date hereof.

   If Isaacs's representations in this paragraph prove to be false, or if he violates the promises made in this paragraph and files a lawsuit, charge, complaint, or appeal of any kind with any court or administrative or governmental agency against the Individual Defendants, based on any events, acts or omissions through and including the date hereof, Isaacs will pay for all costs and losses, including actual attorneys' fees, incurred by Defendants in connection with said lawsuit, charge, complaint, or appeal.

Initialed JDI

1

**5.    Complete Release by Isaacs.**

As a material inducement to USC to enter into this Agreement, Isaacs hereby irrevocably and unconditionally waives and releases all rights and claims, known and unknown, which he may have against each and all of the Individual Defendants and each of their respective assigns, agents, representatives, attorneys, spouses, children and other family members, and all persons acting by, through, under or in concert with any of them, from the beginning of time to the date Isaacs signs this Agreement.  This includes but is not limited to a release of all rights and claims Isaacs may have against the Individual Defendants under any federal or state anti-discrimination statutes, including but not limited to the Americans with Disabilities Act and the Rehabilitation Act of 1973, as well as all claims, known and unknown, which he may have for breach of contract, express or implied; breach of the covenant of good faith and fair dealing; and retaliation, defamation, conspiracy, infliction of emotional distress, invasion of privacy, assault, battery, misrepresentation, or any other tort.

**6.    Knowing and Voluntary Waiver of Known and Unknown Claims**

Isaacs agrees that, as a condition of this Agreement, he expressly releases all rights and claims that he does not know about, as well as those he knows about.  Thus, consistent with the terms of his release, Isaacs expressly waives all rights under Section 1542 of the Civil Code of the State of California, which reads as follows:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

**7.    Encouragement to Consult With Attorney**

Counsel for USC has strongly encouraged Isaacs to consult with an attorney before signing this Agreement, and Isaacs hereby acknowledges that he has either fully consulted with an attorney prior to signing or has knowingly and voluntarily decided not to do so.

**8.    No Representations**

The parties hereto represent and agree that no promises, statements or inducements have been made to them which caused them to sign this Agreement other than those expressly stated in this Agreement.

**9.    Successors**

This Agreement shall be binding upon the parties and upon their respective heirs, administrators, representatives, executors, successors and assigns, and shall inure to the benefit of the parties and others released herein, their representatives, executors, successors and assigns.

Initialed JDI
𝒟ơ𝒟

2

USC 3

10. **Confidentiality of This Agreement**

    a.   As a material inducement for USC to enter into this Agreement, Isaacs agrees not to disclose the negotiation, terms, or conditions of this Agreement to anyone other than Isaacs's attorneys and parents (hereafter referred to as "Isaacs's Confidants") and, even as to such a person, only if such persons agree to honor this confidentiality requirement. Violation of this confidentiality requirement by any of Isaacs's Confidants will be treated as a violation of this Agreement by Isaacs.

    b.   This section does not prohibit disclosure of the negotiation, terms or conditions of this Agreement to the extent necessary legally to enforce this Agreement, nor does it prohibit disclosures to the extent otherwise required by law (but only if the enforcing party notifies the other party and its attorneys of a disclosure obligation or request within three business days after he/it learns of it and does not actively oppose the party taking all steps it deems to be appropriate to prevent or limit the required disclosure).

    c.   If Isaacs is asked about his claims against the Individual Defendants, and only if asked, he may state only that "the matter has been resolved."

11. **Newly Discovered Facts**

    Isaacs acknowledges that he might hereafter discover facts different from or in addition to those he now knows or believes to be true with respect to a claim or claims released herein, and he expressly agrees to assume the risk of possible discovery of additional or different facts, and agrees that this Agreement shall be and remain effective in all respects regardless of such additional or different discovered facts.

12. **Voluntary Participation in This Agreement**

    The parties acknowledge that they have thoroughly discussed all aspects of their rights and this Agreement with their respective attorneys, or have knowingly and voluntary chosen not to do so, and that they have carefully read and fully understand all of the provisions of this Agreement, that they have been given a reasonable period of time to consider signing this Agreement, and that they are voluntarily signing this Agreement.

13. **Governing Law**

    This Agreement is made and entered into in the State of California and shall in all respects be interpreted, enforced and governed under the laws of said State.

14. **Further Necessary Actions**

    The parties agree, without further consideration, to sign and/or cause to be signed, and to deliver to counsel for one another, any other documents and to take any other action as may be necessary to fulfill their obligations under this Agreement, including, but not limited to, effecting the dismissal of all outstanding administrative charges.


Initialed JDI

3

15.   **Severability**

Should any of the provisions in this Agreement, other than the Release set forth in Paragraph 5, be declared or be determined to be illegal or invalid, all remaining parts, terms or provisions shall be valid, and the illegal or invalid part, term or provision shall be deemed not to be a part of this Agreement.

16.   **Proper Construction**

a.   The language of all parts of this Agreement shall in all cases be construed as a whole according to its fair meaning, and not strictly for or against any of the parties.

b.   As used in this Agreement, the term "or" shall be deemed to include the term "and/or" and the singular or plural number shall be deemed to include the other whenever the context so indicates or requires.

c.   The paragraph headings used in this Agreement are intended solely for convenience of reference and shall not in any manner amplify, limit, modify or otherwise be used in the interpretation of any of the provisions hereof.

17.   **Entire Agreement**

This Agreement is the entire agreement between Isaacs and USC and fully supersedes any and all prior agreements or understandings between the parties pertaining to its subject matter.

**PLEASE READ CAREFULLY.  THIS CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE INCLUDES A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS.**

Executed at Berwyn Pennsylvania, this 29th day of August 2007.

By: _Jeffrey D Isaacs_
        Jeffrey Isaacs

Executed at Los Angeles, California, this **31st** day of August 2007.

UNIVERSITY OF SOUTHERN CALIFORNIA

By: _Dennis F Dougherty_
        Dennis F. Dougherty
        **Senior Vice President for Finance**

Initialed JDI

4

## CONFIDENTIAL SETTLEMENT AGREEMENT AND MUTUAL RELEASE

The University of Southern California ("USC") and Jeffrey Isaacs ("Isaacs") have agreed to enter into this Confidential Settlement Agreement and Mutual Release (the "Agreement").

1. **Dismissal With Prejudice.**

Isaacs agrees that he will execute and deliver for filing to counsel of record for USC, Robin D. Dal Soglio of Dal Soglio & Martens LLP, the Stipulation of Dismissal with Prejudice (attached hereto as Exhibit A) of USC from United States District Court Case No. CV-06-3338 GAF (Ex). Counsel for USC will file the Dismissal with Prejudice with the Court.

2. **No Future Application to University.**

Isaacs understands and agrees that his education at USC has ended irrevocably and forever and will not be resumed again at any time in the future. Isaacs further agrees that he will not apply for or otherwise seek admission to USC or any related or affiliated entity at any time in the future, under any circumstances whatsoever.

3. **Non-Admission of Liability.**

This Agreement shall not in any way be construed as an admission by USC that it has discriminated against or retaliated against Isaacs in any way, or otherwise acted wrongfully with respect to Isaacs or any other person, or that Isaacs has any rights whatsoever against it. USC specifically denies that it has any liability to or has done any wrongful acts against Isaacs or any other person.

4. **Benefits for Isaacs.**

Within fourteen (14) days of USC's receipt of the original of this Agreement signed by Isaacs and including executed copies of Exhibits A and B, USC will transmit to Isaacs one check made payable to Isaacs in the gross amount of Ten Thousand Dollars ($10,000).

5. **Responsibility for Taxes.**

Isaacs understands and acknowledges that USC will report the payment described in paragraph 4 to the appropriate taxing authorities as required by law. Isaacs agrees that he is solely responsible for all tax obligations, including, but not limited to, all payment obligations which may arise as a consequence of this Agreement. Isaacs further agrees promptly to pay and to indemnify and hold USC and others released herein harmless from and against any and all loss, cost, damage or expense, including, without limitation, attorneys' fees, interest, assessments, withholding and penalties, arising out of any dispute over underwithholding or other tax treatment of any of the proceeds received by Isaacs as a result of this Agreement. Isaacs further agrees not to seek or make any claim against USC or others released herein for any loss, cost, damage or expense if a claim or adverse determination is made in connection with underwithholding or other tax treatment of any of the proceeds of this Agreement or any portion

Initialed _____

1

USC 6

thereof. Isaacs understands and agrees that neither USC nor others released herein has any duty to defend against any claim or assertion in connection with underwithholding or other tax treatment of the proceeds of this settlement or any portion thereof, and Isaacs agrees to assume full responsibility for defending against any such claim or assertion.

### 6. No Other or Future Lawsuits, Charges, Claims for Arbitration or Complaints of Any Nature Whatsoever.

With the exception of United States District Court Case No. CV-06-3338 GAF (Ex), which is fully and finally settled herein, Isaacs represents that he has not filed any other lawsuits, charges, claims for arbitration, complaints, or appeals of any kind with any court or administrative or governmental agency against USC or any other persons or entities released herein, and he agrees that he will not file any lawsuits, charges, claims for arbitration, complaints, or appeals at any time hereafter based on, referring to, or incorporating any events, acts or omissions through and including the date hereof.

If Isaacs's representations in this paragraph prove to be false, or if he violates the promises made in this paragraph and files a lawsuit, charge, claim for arbitration, complaint, or appeal of any kind with any court or administrative or governmental agency against USC or any other persons or entities released herein, based on any events, acts or omissions through and including the date hereof, Isaacs will pay for all costs and losses, including actual attorneys' fees, incurred by USC in connection with said lawsuit, charge, complaint, or appeal.

### 7. Complete Release by Isaacs.

As a material inducement to USC to enter into this Agreement, Isaacs hereby irrevocably and unconditionally waives and releases all rights and claims, known and unknown, which he may have against USC, the Keck School of Medicine, and each of their respective successors, assigns, agents, trustees, officers, administrators, faculty, students, current and former employees, representatives, attorneys, divisions, subsidiaries, affiliates (and agents, trustees, officers, administrators, faculty, current and former employees, representatives and attorneys of such divisions, subsidiaries, and affiliates), and Robert Baughman and each of his family members, and all persons acting by, through, under or in concert with any of them (collectively, the "Releasees") from the beginning of time to the date Isaacs signs this Agreement from any and all claims, demands, contracts, expenses, liens, covenants, debts, attorney's fees, causes of action, damages, judgments, orders, and liabilities (collectively "Claims") of whatever kind or nature in law, equity, or otherwise, whether now known or unknown, suspected, or unsuspected, and whether or not concealed or hidden, which Isaacs now owns or holds or had at any time heretofore owned or held against the Releasees.

Initialed 

2

8.   **Release by USC**

        As a material inducement to Isaacs to enter into this Agreement, USC does hereby irrevocably and unconditionally release, acquit and forever discharge Isaacs from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, grievances, costs, losses, and expenses (including attorneys' fees and costs) of any nature whatsoever, known or unknown, suspected or unsuspected, fixed or contingent, including but not limited to any claim for malicious institution of civil proceedings, and abuse of process.  Notwithstanding any other provision herein, this release by the University is not intended to, and does not, release debts unrelated to the lawsuit, including but not limited to tuition or loans.

9.   **Knowing and Voluntary Waiver of Known and Unknown Claims**

        Consistent with the terms of their respective releases in paragraphs 7 and 8, Isaacs and USC acknowledge and agree that, as a condition of this Agreement, they expressly release all rights and claims that they do not know about, as well as those they know about.  Thus, consistent with the terms of their respective releases, Isaacs and USC expressly waive all rights under Section 1542 of the Civil Code of the State of California, which reads as follows:

> "A general release does not extend to claims which the creditor
> does not know or suspect to exist in his or her favor at the time of
> executing the release, which if known by him or her must have
> materially affected his or her settlement with the debtor."

10.   **Ownership of Claims**

        Isaacs represents and agrees that he has not assigned or transferred, or attempted to assign or transfer, to any person or entity, any of the claims he is releasing in this Agreement.

11.   **Encouragement to Consult With Attorney**

        USC encourages Isaacs to consult with an attorney before signing this Agreement, and Isaacs hereby acknowledges that he has had the opportunity to consult with an attorney prior to signing, and has either done so or voluntarily chosen not to do wo.

12.   **No Representations**

        The parties represent and agree that no promises, statements or inducements have been made to them which caused them to sign this Agreement other than those expressly stated in this Agreement.


Initialed  2 DA

3

### 13.  Successors

This Agreement shall be binding upon the parties and upon their respective heirs, administrators, representatives, executors, successors and assigns, and shall inure to the benefit of the parties and others released herein, their representatives, executors, successors and assigns.

### 14.  Confidentiality of This Agreement

a.  As a material inducement for USC to enter into this Agreement, Isaacs agrees not to disclose the negotiation, terms, conditions, or amount of this Agreement to anyone other than Isaacs's attorneys and tax adviser (hereafter referred to as "Isaacs's Confidants") and, even as to such a person, only if the person agrees to honor this confidentiality requirement. Violation of this confidentiality requirement by any of Isaacs's Confidants will be treated as a violation of this Agreement by Isaacs.

b.  This section does not prohibit Isaacs's disclosure of the negotiation, terms, conditions, or amount of this Agreement to the extent necessary legally to enforce this Agreement, nor does it prohibit disclosures to the extent otherwise required by law (but only if Isaacs notifies USC and its attorneys of a disclosure obligation or request within three business days after he learns of it and does not actively oppose USC's taking all steps it deems to be appropriate to prevent or limit the required disclosure).

c.  If Isaacs is asked about his claims against USC, including breach of enrollment contract and wrongful dismissal, and only if asked, he may state only that "the matter has been resolved." However, the parties further agree that Isaacs is not required to disclose this matter to anyone.

### 15.  Damages for Isaacs's Breach of Confidentiality

A breach of paragraph 14 will be deemed a material breach of this entire Agreement. Isaacs agrees to pay USC the sum of Five Thousand Dollars ($5,000) as liquidated damages for each violation in the event USC obtains a judgment, ruling, award, or decision that paragraph 14 has been violated. The parties to this Agreement agree that this liquidated damages provision is appropriate with regard to any breach of paragraph 14 because: (1) paragraph 14 is essential for the protection of USC's interests; (2) damages for breach of paragraph 14 would be difficult to prove with certainty; and (3) the sum of Five Thousand Dollars ($5,000) per breach represents a reasonable estimate of the harm likely to result from each such breach.

### 16.  Newly Discovered Facts

Isaacs acknowledges that he might hereafter discover facts different from or in addition to those he now knows or believes to be true with respect to a claim or claims released herein, and he expressly agrees to assume the risk of possible discovery of additional or different facts, and agrees that this Agreement shall be and remain effective in all respects regardless of such additional or different discovered facts.



4

USC 9

17.  **Voluntary Participation in This Agreement**

The parties acknowledge that they have thoroughly discussed all aspects of their rights and this Agreement with their respective attorneys, or have knowingly and voluntary chosen not to do so, and that they have carefully read and fully understand all of the provisions of this Agreement, that they have been given a reasonable period of time to consider signing this Agreement, and that they are voluntarily signing this Agreement.

18.  **Governing Law**

This Agreement is made and entered into in the State of California and shall in all respects be interpreted, enforced and governed under the laws of said State.

19.  **Further Necessary Actions**

The parties agree, without further consideration, to sign and/or cause to be signed, and to deliver to counsel for one another, any other documents and to take any other action as may be necessary to fulfill their obligations under this Agreement, including, but not limited to, effecting the dismissal of all outstanding administrative charges.

20.  **Severability**

Should any of the provisions in this Agreement, other than the Release set forth in Paragraph 7, be declared or be determined to be illegal or invalid, all remaining parts, terms or provisions shall be valid, and the illegal or invalid part, term or provision shall be deemed not to be a part of this Agreement.

21.  **Proper Construction**

a.  The language of all parts of this Agreement shall in all cases be construed as a whole according to its fair meaning, and not strictly for or against any of the parties.

b.  As used in this Agreement, the term "or" shall be deemed to include the term "and/or" and the singular or plural number shall be deemed to include the other whenever the context so indicates or requires.

c.  The paragraph headings used in this Agreement are intended solely for convenience of reference and shall not in any manner amplify, limit, modify or otherwise be used in the interpretation of any of the provisions hereof.

22.  **Entire Agreement**

This Agreement is the entire agreement between Isaacs and USC and fully supersedes any and all prior agreements or understandings between the parties pertaining to its subject matter.

Initialed A 2 D

USC 10

**PLEASE READ CAREFULLY.  THIS CONFIDENTIAL SETTLEMENT AGREEMENT AND MUTUAL RELEASE INCLUDES A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS.**

Executed at <u>Saint-Jean, FRANCE</u> this 31st day of March 2008.

By: _____
    Jeffrey Isaacs

Executed at Los Angeles, California, this _____ APR 0 4 _____ 2008.

UNIVERSITY OF SOUTHERN CALIFORNIA

By: _____
    Dennis F. Dougherty
    Senior Vice President for Finance

6

**Page 57**

1  disorders, helps you understand different
2  approaches that you might take to them. So
3  while I would say I would not lie to a patient,
4  I think that there are ways that you might
5  deliver information that varies from patient to
6  patient based on their diagnoses. And perhaps
7  in that context that we were talking about it
8  or having that sense of transference and
9  counter transference, that you took something
10  away from that session.
11  Q. So could that transference or counter
12  transference have ever made you uncomfortable
13  to narcissistic patients to the point where you
14  felt queasy or almost thinking about vomiting.
15  A. No. I would say that would not be the
16  case.
17  Q. Okay. So when I identified Traum,
18  Shindler and Nunberg, would I have been the
19  fourth unexpected vacancy in those six months
20  if I had been fired or quit?
21  MR. CHABOT: I'm just going to object
22  to the form of that question.
23  A. Yes. Again, I would need to look at

**Page 58**

1  the records to determine the dates.
2  Q. Would that have a pretty big budget
3  impact for the department if there were four
4  vacancies?
5  MR. CHABOT: Objection, foundation.
6  A. There are no budgetary impact on the
7  department as far as I know.
8  Q. Doesn't the department or the hospital
9  receive Medicare direct GME subsidies for each
10  resident?
11  A. I'm not aware of the specifics of the
12  Medicare reimbursement for training.
13  Q. So you don't know that Medicare pays
14  about $100,000 a year for residents to train
15  them?
16  MR. CHABOT: Object to the form. It's
17  leading and also assumes facts.
18  A. I do not know that.
19  Q. Do you think most program directors
20  would know where the funding comes from for
21  their program?
22  MR. CHABOT: Objection, foundation.
23  A. I don't know what most program

**Page 59**

1  directors know. I just know that that is not
2  relevant to my day-to-day functioning as a
3  program director.
4  Q. Doesn't the U.S. Government invest a
5  sizable amount of money in the training of
6  resident physicians?
7  MR. CHABOT: Objection, foundation.
8  A. Yes. The government is a major source
9  of funding for graduate medical education in
10  the U.S.
11  Q. Would it be fair to say that the
12  plastic surgeon fired from DHMC two days before
13  she finished, that DHMC received about half a
14  million dollars of government funding to train
15  her?
16  MR. CHABOT: Objection, foundation.
17  MR. KAPLAN: I'm going to object to
18  the question as well, and I appreciate the fact
19  that you can finally differentiate between
20  Dartmouth and DHMC.
21  DR. ISAACS: She wasn't with the
22  psychiatry department, she was with the plastic
23  surgery department. That's actually why I did

**Page 60**

1  that, Attorney Kaplan.
2  A. Again, I don't know the specifics of
3  the reimbursement of the medical center by
4  Medicare for training.
5  Q. Okay. You are salaried by Dartmouth
6  College, correct?
7  A. Correct.
8  Q. How much of that salary comes from
9  DHMC?
10  A. With my current job description I
11  believe that the 50 percent covering my program
12  director role.
13  Q. Okay. So roughly would that be
14  roughly in the range of $150,000 a year from
15  Dartmouth Hitchcock?
16  A. I wish. No, not at all, so--
17  Q. Would the vacancy of four residents
18  just cause logistical problems in training?
19  A. It would have the potential to,
20  depending on what year they were or what
21  services they were rotating on at the time.
22  Q. Was this part of the reason you didn't
23  fire the Plaintiff when you learned about

Jeffrey D. Isaacs, M.D. v.
Dartmouth Hitchcock Medical Center, et al

Christine Finn, M.D.
January 15, 2014

Page 61

1   Arizona and USC?
2       MR. CHABOT: Object to the form.
3   A.  In terms of the timing, I was not
4   aware of the Arizona residency training until
5   we sat down in that meeting in January, that
6   week in January where we made the decision to
7   place you on administrative leave.  And I was
8   not aware of the USC Medical School issue until
9   sometime several weeks after that.
10  Q.  How did you learn about USC?
11  A   Attorney Kaplan told me.
12  Q.  Why would you ask Attorney Kaplan to
13  research that?
14      MR. CHABOT: I am going to object to
15  the form.  That's misrepresenting prior
16  testimony.
17  A.  I did not ask him to research that.
18  Q.  Did anyone at Dartmouth know about my
19  enrollment at USC prior to that?
20  A.  Not to my knowledge.  Sorry.
21      MR. CHABOT: That's okay.
22  Q.  Would you know if someone did?
23      MR. CHABOT: I am going to object on

Page 62

1   the grounds of foundation.
2   A.  If someone knew and never mentioned it
3   to me, I would have no way of knowing that they
4   knew.
5   Q.  Actually now you may have learned
6   things through the lawsuit, have you learned
7   since then that someone knew before you?
8   A.  No.
9   Q.  Do you know any psychiatrists at the
10  UCLA Neuropsychiatric Institute in Los Angeles?
11  A.  I don't think so.
12  Q.  Have you ever spoken to a Dr. Wayne
13  Sandler?
14  A.  Not that I'm aware of.
15  Q.  Do you know any psychiatrists at the
16  University of Miami Teaching Program?
17  A.  Yes, I think I do.
18  Q.  Who do you know there?
19  A.  Jorge Sortello.
20  Q.  Anyone else?
21  A.  I don't think so.
22  Q.  Do you know anyone who's ever treated
23  the Plaintiff medically aside from Dartmouth

Page 63

1   Hitchcock?
2   A.  Not that I'm aware of.
3   Q.  Do you know a Dr. Ben Boswell?
4   A.  No.
5   Q.  Have you ever heard that name, a
6   psychiatry resident?
7   A.  No.
8   Q.  Did you know any Dr. Graves in the
9   southern hemisphere?
10  A.  No.
11  Q.  Do you know Dr. Greenaw in the sleep
12  department?
13  A.  Yes.
14  Q.  How do you know him?
15  A.  He's one of my colleagues at DHMC.
16  Q.  Are you closer to him than other
17  colleagues, or is he just kind of an adjunct
18  colleague?
19      MR. KAPLAN: Object to the form.
20  A.  We have relatively little professional
21  overlap other than his being the fellowship
22  director for the sleep program, so most of our
23  connection is through our interest in resident

Page 64

1   and fellowship education.
2   Q.  Did you ever speak to him about the
3   Plaintiff's sleep studies with him?
4   A.  No.
5   Q.  Do you know a Dr. Amy Baughman?
6   A.  No.
7   Q.  Have you ever heard that name?
8   A.  No.
9   Q.  Do you know a Dr. Robert Baughman?
10  A.  No.
11  Q.  You don't know, do you know what the
12  NINDH is of the NIH?
13  A.  No.
14  Q.  Could you guess what NINDS stands for?
15  A.  That's what I'm trying to figure out.
16      MR. CHABOT: I'm going to instruct you
17  not to guess.  We're not here to provide
18  guesses or speculation.
19  Q.  Do you know anyone at Dartmouth
20  Hitchcock or Dartmouth College that might know
21  Dr. Robert Baughman?
22      MR. CHABOT: Objection to foundation.
23  A.  I don't know who he is, so it's hard

from **Jeffrey Isaacs** jdi@bakerisaacs.com       Feb 6
sender- Sent at 1:41 PM (GMT-05:00). Current time
time there: 8:08 PM. *v*
     to president's.office@dartmouth.edu,
     jim.y.kim@dartmouth.edu

     cc George Baker <cavu96@gmail.com>

     date Mon, Feb 6, 2012 at 1:41 PM
    subject Investigation
mailed-by bakerisaacs.com
Dear President Kim,

I am pleading that you help investigate a matter that is causing me
the worst distress I have ever suffered in life. As a proud alumni of
the College, it is my hope that a proper investigation will yield the
truth and clear my name. For some background, I am attaching a civil
suit filed Friday in the United States District Court. However, I
believe that Dartmouth possesses evidence which goes well beyond the
allegations in the lawsuit. Basically, [REDACTED PREVIOUS LITIGATION] six years ago.
Subsequently, I believe that I am a victim
of fraud and blackmail, perpetrated by several Dartmouth College
psychiatry professors. This is not just my belief, it is the strong
suspicion of my parents, friends, and others, whom I give you full
permission to speak to as part of any investigation ordered by
yourself or the Trustees.

I am asking the College for help on this matter
[redacted]

Please consider my request and do not hesitate to contact me for any
further information.


Regards,
Jeffrey Isaacs

Page 293

A. It does say that.
Q. So wouldn't it be assumed they didn't find anything wrong, or do you think they found something wrong and just chose to honor my request?
MR. CHABOT: Objection, foundation.
MR. KAPLAN: Objection, foundation.
A. I can't really say.
Q. So you think it's possible that they determined against me but chose not to tell anyone?
MR. CHABOT: Same objection.
A. I'm not familiar with their policies or procedures regarding the application requirements.
Q. If they agreed with my interpretation of the two settlement agreements, would you believe that you were wrong on your termination letter regarding USC?
MR. KAPLAN: Note my objection.
A. I think that the USC information was in line with other previous concerns about lying, but again, was not found out until

Page 294

significantly after the decision was already made.
Q. But you do have to answer the question. Do you think you were wrong on the USC matter and the termination letter if indeed ERAS agreed with interpretation of the settlement?
MR. KAPLAN: I'm going to object to the question because it calls for a conclusion I don't believe this witness is qualified to make, but you can go ahead.
A. I think the general omission was the concern. It was never specific to the USC complaint.
Q. I'll rephrase the question. Is ERAS or is AAMC the administrator for ERAS? Do they have authority over their service?
A I don't know.
Q. Don't they have an investigation unit called ERAS Investigations?
A. I don't know.
Q. So would you trust, if they do have an investigation unit, would you trust their

Page 295

decisions?
A. Yes.
Q. So if they decided that there was no problem with USC on my application, would your statement on the termination letter be wrong?
MR. CHABOT: I'm going to object to the question for the reasons stated by Attorney Kaplan earlier.
A. What was the question?
Q. I'll just repeat it.
(The record was read as requested.)
MR. CHABOT: Did you get that, Dr. Finn?
A. I guess I'm still not clear what statement you're referring to, the statement, that that together with the other concerns.
Q. So you enumerated certain items in the termination letter. One of them was you failed to disclose USC Keck on your ERAS application. So there's that statement which is an enumerated cause of termination among about six others. But that statement is what I'm referring to. And we can go back and look,

Page 296

but that statement, if ERAS investigations determined differently, would you say you were wrong or would you disagree with ERAS?
MR. CHABOT: Hypothetically speaking?
Q. I don't think it's hypothetical. She just doesn't know who ERAS investigations is, but it's not really hypothetical.
MR. CHABOT: That's also not what the document says. Just note my objection.
MR. KAPLAN: Note my objection as well.
Q. Well, I don't think it's a hypothetical, but if that's how she wants to answer it.
A. It's hypothetical in the sense that this information was not available to me at that time.
Q. I'm saying now. Now if you agree that they made that determination but you don't seem to know but if that was proven to you, would you then believe your letter, that enumerated item was wrong or would you think they were incorrect, ERAS?
MR. CHABOT: Objection to the form of

