Dr Jeffrey Isaacs
3553 West Chester Pk #177
Newtown Square, PA 19073

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

|  |  |  |
|---|---|---|
| DR. JEFFREY ISAACS | ) | |
| Plaintiff, | ) | Case 2:19-CV-02011-DSF-RAO |
| | ) | |
| vs. | ) | |
| | ) | **PLAINTIFF'S AMENDED** |
| DARTMOUTH HITCHCOCK MEDICAL CENTER, | ) | **COMPLAINT FOR DAMAGES,** |
| GEISEL SCHOOL OF MEDICINE AT DARTMOUTH, | ) | **DECLARATORY, AND** |
| USC KECK SCHOOL OF MEDICINE, | ) | **INJUNCTIVE RELIEF** |
| NH BOARD OF MEDICINE | ) | |
| and | ) | |
| JOHN or JANE DOE | ) | |
| Defendants. | ) | DEMAND FOR JURY TRIAL |
| | ) | |

## PLAINTIFF'S AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, AND

## INJUNCTIVE RELIEF

### I.    INTRODUCTION

1. Plaintiff Jeffrey Isaacs enrolled in the USC Keck School of Medicine Class of 2009 in what by all means seemed to be the beginning of a promising medical career. By the end of the first semester, somewhat by accident he found himself in possession of evidence of corruption and abuse of power an NIH director and the Dean of Keck. Specifically, a dispute had arisen where a Class of 2009 classmate bragged to him and threatened him regarding 'connections' that got her into Keck, and verifiable electronic mail routing records furthered revealed her purported claims.

2. Over the next decade, the Keck Dean and his two successors would be alleged or found guilty of serious abuses of power, including using Schedule II substances, i.e. crack cocaine, with students, as well as harassing junior medical researchers. Furthermore, the Department of Justice would initiate charges of widespread admissions impropriety at USC. Those two facts, however, weren't known at the time Isaacs began studies at Keck. He was ousted from the university, and immediately brought foreboding claims of 'favoritism' and 'scapegoating' in this District Court.

3. After protracted litigation and negotiations with Keck, two settlement agreements were reached that acquitted Isaacs of charges, sealed all disciplinary records, dismissed all administrative charges, and cancelled all contracts between the parties. Years went by; Isaacs excelled without further incident at international medical school with training in London as well as Mount Sinai New York and Cleveland Clinic, and achieved a top decile national board score higher than the average neurosurgeon, his intended medical specialization.

4. His achievement and persistence fueled an organized and relentless retaliation against him that continues to the present day. With his newly achieved medical diploma, Dr. Isaacs began residency training at Dartmouth. Knowledge of the sealed USC controversy, through John Doe, reached Dartmouth's medical school some five years after it began. John Doe's identity has been never been revealed by the Defendants and the Defendants have taken steps to conceal his or her identity. Motivated by John Doe's influence, Isaacs's arrival at Dartmouth was met with the strongest resistance. He was treated unethically and suffered extraordinary stress. Dartmouth terminated Isaacs without the normal peer review hearing process required by hospital bylaws.

5. Former Dartmouth & World Bank President Jim Yong Kim was notified to preserve evidence for federal court review of the circumstances. Within a week, Dr. Isaacs' emails and medical records at Dartmouth completely disappeared. Ultimately, the corruption extended from high academia to government officials. Dartmouth sent the sealed Keck records to the New Hampshire Board of Medicine. The Board, in turn, published the false, sealed records on the internet in an outrageous fake order that declared the records had never been sealed.

6. Such activity precisely captures why Congress enacted the RICO Act – to prevent and expose the infiltration of legitimate institutions by corrupt individuals. To be sure, each institution named in this lawsuit is an otherwise venerable institution where the Plaintiff did, and does, seek to resume his medical research career. The Defendants executed constant, longstanding, and corrupt schemes intended to deprive Plaintiff of his medical career. Indeed, Plaintiff's fourteen year saga to practice medicine is unheard of for a physician with his top academic ranking and no other bar to employment.

7. As a jury shall determine, Defendants willfully violated civil and criminal RICO statutes over a fourteen year period by recruiting new individuals to carry out an orchestrated pattern of retaliations, due process violations, and judicial obstructions meant to prevent Dr  Isaacs from ever becoming a doctor.

## II.    JURISDICTION AND VENUE

12. Venue in the California Southern District is proper under 28 U.S.C. § 1391,  because the dispute transpired and originated in the district. Additionally, the settlement agreements and disclosures by John or Jane Doe, central to this case, necessarily stemmed from this

district. The Plaintiff was retaliated against, for fourteen years, because he was a witness in an official proceeding in this district.

13. Jurisdiction in this Court arises under 28 U.S.C. § 1331, for federal questions presented pursuant to 18 U.S.C. § 1965 (RICO). Diversity jurisdiction is invoked pursuant to 28 U.S.C. § 1332. Subject matter jurisdiction for declaratory relief exists under 28 U.S.C. § 2201 and 2202 and Rule 57 of FRCP, because an actual justiciable controversy exists. Injunctive relief is sought under aforementioned code and *Bivens* doctrine of implied cause of action.

### III.   PARTIES

14. Plaintiff Dr. Jeffrey Isaacs is a citizen of the Commonwealth of Pennsylvania. Dr. Isaacs holds an A.B. from Dartmouth College, an MBA from Wharton/Insead, and an M.D. issued in 2010 from the American University of the Caribbean. He began medical training with Defendant Keck in 2005. Fourteen years after federal controversy commenced, the Defendants continue to improperly prevent him from obtaining necessary federally funded residency (GME) training for medical licensure.

15. Defendant New Hampshire Board of Medicine ("The NH Board") is a New Hampshire government organization, formed as a group of individuals who convene at 121 South Fruit Street, Suite 301, Concord, NH 03301-2412 under the color of New Hampshire state law. The individuals, specifically, include prosecutor and investigator Jeff Cahill, administrator Penny Taylor, and the voting members of the Board. Claims against "the NH Board" are invoked against both the organization, as defined under NH RSA, as well as the aforementioned individuals, who shall be considered to be enumerated defendants in the caption of this lawsuit.

16. Defendant Dartmouth Hitchcock Medical Center is a non-profit corporation with a principal address of One Medical Center Drive, Lebanon, NH 03756. Defendant Dartmouth Hitchcock Medical Center does not have a registered agent in the State of New Hampshire. Plaintiff was a salaried employee of Mary Hitchcock Memorial Hospital, related to DHMC, but was a student trainee of Dartmouth College.

17. Defendant Geisel School of Medicine is a DBA for Trustees of Dartmouth College which has a principal office address at 63 South Main Street, Ste. 301, Hanover, NH 03755 and no registered agent. According to its webpage, the Board of Trustees "has ultimate responsibility for the financial, administrative and academic affairs of [Dartmouth] College.' Plaintiff's applications to study GME have been declined as recently as the 2019 academic year by faculty employed by or associated with the College. For convenience, causes of action against "Dartmouth" and "Dartmouth Defendants" refer to both DHMC & Trustees of Dartmouth College, because Plaintiff was both a GME student at Dartmouth Medical School and a salaried employee of their teaching hospital. Historically, Graduate Medical Education participants are considered students of their trade and receive a diploma upon 'graduating' residency. To the extent the Dartmouth College professors in this matter were also attending physicians at DHMC, both roles are invoked independently and simultaneously.

18. Defendant USC Keck School of Medicine ("Keck") is located at 1975 Zonal Avenue in Los Angeles, in the Southern California District. In 2008, Plaintiff and Keck settled a lawsuit in this district, CV-06-3338-GAF. This complaint alleges witness retaliation to present day for disclosure of federal violations disclosed during the litigation.

19. Information about John and/or Jane Doe will be amended when available.

# IV. FACTUAL HISTORY

20. The original complaint in this action was finalized on March 11 2019. In this action, and a related 2006 action, the Plaintiff alleged admissions corruption, as well as an administrative cover-up and retaliation, that happened shortly after he matriculated into the Class of 2009 M.D. program at the Keck School of Medicine at University of Southern California. On March 12, 2019 federal RICO charges in "Operation Varsity Blues" were formally filed against USC for corrupt and criminal admissions procedures. The aforementioned federal investigation exposed widespread bribery, favoritism, and other corruption in USC's admissions process.

21. During the first semester at Keck, Plaintiff commenced a relationship with a fellow Keck Classmate, one A.B. As the matter turned sour, A.B. made threatening statements to the Plaintiff, such as "I got into Keck through my connections, I'll get a residency through my connections, don't mess with me." [1]

22. At the time, email return receipt technology was new and developing. An electronic message Plaintiff had sent to A.B. started registering return receipts at NIH headquarters and the Zilkha Neuroscience Center Executive Office at Keck.

23. Plaintiff was concerned that A.B. was fostering rumors and gossip among classmates, and extending, he believed, to scientists at Zilkha her father knew. Plaintiff, who had a semester at Vanderbilt Law completed, sent a cease and desist letter on a United States District Court cover sheet to A.B demanding "inappropriate communications with Zilkha" officials cease, thinking it would be the end of it. He was wrong; fifty pages

---

[1] Indeed, A.B. has attained faculty appointment at Harvard Medical School, while Plaintiff – with his higher merit scores – has spent well over a decade trying to correct the wrongs inflicted by the Defendants.

follow in this complaint of abbreviated events and claims that would follow him for fourteen years.

24. Little did Plaintiff know, the Zilkha scientist was in fact the Dean of Keck, Brian Henderson. Henderson had recently been promoted to deanship after raising $40 million for the Zilkha institute, at least in part with NIH funds controlled by A.B.'s father.

25. Shortly thereafter, USC Security served Plaintiff with a "stay-away" order from classmate A.B. Also at the suggestion of the Keck Administration, A.B. sought to press charges with the LAPD against the Plaintiff. The LAPD declined to press charges related to the petty dispute. Plaintiff contended the "stay-away" order was being used by A.B. to embarrass him amongst his classmates.

26. Plaintiff learned in February 2006 that the Zilkha scientist's true identity was Dean Henderson. He immediately went to Dean Clive Taylor attempting to mitigate the circumstances, and said "I'm being kicked out for accidentally blackmailing the Dean," to which Taylor replied "Sometimes Jeff, you get a raw deal in life."

27. Plaintiff emailed an apology to A.B., hopeful it was the best way to resolve the situation. A.B. initially accepted the apology, and emailed the Dean that she didn't want to be responsible for further disciplinary action against Plaintiff, who she said "wasn't a [bad] person."

28. However, the Junior Keck Dean, Peter Katsufrakis, hauled Plaintiff before the Keck Student Performance Committee, and disciplined him. In truth, the Deans disciplined Isaacs to discredit, and out of anger for, his preliminary criminal and civil claims, which included abuse of office, corruption and bribery. This reasoning was not communicated to the voting faculty members, who were instead given Plaintiff's "apology email" as a

pretextual termination reason. Formally, the SPC charged Plaintiff with inability "to maintain Essential Characteristics & Abilities" of a Keck student, resulting in separation from the university. Katsufrakis' corrupt and retaliatory actions initiated Keck's role in the management and operation of an illegal enterprise. To the extent later settlements may have waived claims against Keck, a private criminal waiver contract does not legally preclude criminal charges. RICO is a criminal and civil cause of action, and thus Plaintiff did not waive RICO claims.

29. Plaintiff was hospitalized with what appears to have been an Adjustment Disorder, stemming from the trauma of losing his place in medical school.

30. Plaintiff filed a federal lawsuit, CV-06-3338-GAF, against Keck, Henderson, Katsufrakis, and A.B's father. For unknown reasons, in 2006 Deans Henderson and Katsufrakis left their Deanship posts at Keck. Additionally, A.B's father left the NIH to move to Okinawa, Japan.

31. Exhaustive settlement discussions took place over nearly two years. See *Amended Complaint Exhibits* (Pages 1-63) & *Affidavit of Dr Jeffrey Isaacs*, both of which are hereby incorporated entirely herein as facts in this complaint. Plaintiff's attorney Michel Payne exited discussions with USC Counsel, citing "unprofessional" conduct in simultaneously dishonoring settlement offers and riding out the discovery clock.

32. Nonetheless, two settlement agreements were reached over these two years. The first agreement, the "Individual Settlement," sealed Isaacs' disciplinary records, in exchange for Isaacs dropping any claims against the individuals, i.e. Katsufrakis, Henderson, and R.B.

33. Keck drafted the Individual Settlement days after Isaacs filed the "Zilkha tracking evidence" in court for the first time, which they also threatened to sanction him for filing. That settlement dismissed the individual defendants from the suit, including the USC Dean and a National Institutes of Health official. Paragraph 2 of that Agreement was entitled "Sealing of Disciplinary Records," and read:

> "In exchange for the Dismissal with Prejudice of the Individual Defendants, referenced above, Defendant USC agrees that commencing immediately upon the execution of this Settlement Agreement and receipt of the signed Dismissal with Prejudice, *USC will not release or disclose Isaacs' disciplinary records to any third party*, including but limited to other educational institutions and/or potential employers, unless it receives written consent from Isaacs or a subpoena or court order."

34. There was no consideration for Isaacs in the Individual Settlement other than the "factual innocence" provided by a record seal. Both the intent, and plain language use of "sealing" in the agreement were unambiguous to both parties. California Code 851.8 sealing procedures for factual innocence and exoneration were intended to apply, analogously, in this educational sealing, to which there was no direct statutory authority. Isaacs accepted the Individual Settlement offer in September 2007, and in related correspondence had stated "By completely sealing and clearing my record at USC, your client will be removing any burden on me to disclose these events in future career endeavors. I have been fortunate enough to receive a second chance [at medical school]."

35. The additional intent of the settlement was to allow Isaacs, who was already well in his second year of medical school at AUC, to move on and continue his career in medicine.

36. A second settlement, the Global Settlement agreement between USC and Dr. Isaacs ended the litigation with that institution. The excerpted paragraph 8 of that agreement stated that, "[a]s a material inducement to Isaacs to enter into this Agreement, USC does hereby irrevocably release, acquit and forever discharge Isaacs from any and all charges . . . obligations, promises, agreements . . . of any nature whatsoever, known or unknown . . ." *Id.*

37. This settlement agreement further dismissed any outstanding administrative charges against Dr. Isaacs. Likewise, it acquitted him of charges of failing to "maintain Essential Characteristics" which lead to his discipline, in a redundant exoneration to the Individual Settlement agreement.

38. But the primary intent of the Global Settlement, negotiated over eighteen months, was to allow Isaacs the relatively "minor point" of not having to disclose his mere attendance at USC in the future. It did this by annulling any contracts between the parties. Comparatively, one may deny any retroactively annulled contract.

39. This agreement was drafted by Keck days after a teleconference between Isaacs and USC Counsel, in which he informed them discovery would also address claims of unusual abuse of power, and predatory tactics, by Dean Katsufrakis.

40. Both of Katsufrakis' successors likewise were terminated from USC for abuse of power and sexual misconduct. Dean Carmen Puliafito was found to have provided and used crack cocaine with a twenty year addict. Dean Rohit Varma was terminated for sexually harassing a young researcher. This constitutes a pattern of failed deanship supervision.

41. In sum, both of Isaacs' claims that USC suffered from a pattern of inadequate supervision and reporting procedures for Dean misconduct, and that USC turned a blind eye to a pattern of admissions bribery, would prove true a decade later.

42. According to USC Counsel who drafted the Global Settlement, she "re-opened the issue to have USC advise [Plaintiff] of his need to disclose the academic history." Hours later, she sent him the final Global Settlement, with revised language stating "the parties further agree that Isaacs is not required to disclose this matter to anyone."

43. USC provided expert advice, coercion, guarantee, promises, and/or suggestions that the Global Settlement annulled the enrollment contract and the respective academic history was thereby, in entirety, subject to confidentiality clauses "not requiring" disclosure to any third party.

44. Based primarily on the quoted language of the two settlement agreements and the advice of USC, and his attorney at the time, Dr. Isaacs understood that anything relating to his attendance at Keck was sealed and could not be disclosed by anyone, including Dr. Isaacs.

45. There are very few civil cases of sealed disciplinary academic records, and little legal precedent as to how they should be handled by the courts.

46. Well known entities that can be sealed and rightfully disavowed include criminal arrests, marriages, and other serious matters. There is no known law in any United States jurisdiction forbidding a university from likewise contracting with a student to seal and/or annul a discipline.

47. Here, a relevant federal statutory regulation is 20 U.S. Code § 1232g - Family educational and privacy rights.

48. Specifically, the provision dealing with disciplinary records is instructive:

"(h)Disciplinary records; disclosure

Nothing in this section shall prohibit an educational agency or institution from—

(1) including appropriate information in the education record of any student concerning disciplinary action taken against such student for conduct that posed a significant risk to the safety or well-being of that student, other students, or other members of the school community; or (2) disclosing such information to teachers and school officials, including teachers and school officials in other schools, who have legitimate educational interests in the behavior of the student. (i) Drug and alcohol violation disclosures" 20 U.S. Code § 1232g.

49. In simple terms, FERPA and other routine liability laws normally would grant Keck an absolute right and duty to disclose a student's disciplinary records to another university with a vested interest. Moreover, FERPA would require Isaacs to consent before Keck releasing his records to third parties.

50. By "sealing" the disciplinary records so that future disclosure would be prohibited even to interested parties, and hence outside the realm of FERPA, Keck expunged Isaacs' student record. If those records had not been expunged/annulled with these settlement agreements, Keck would be in violation of FERPA and other statutory and common liability laws by failing to report the discipline to an educational institute with an interest in knowing.

51. With reliance upon the fact that the settlement agreements placed his issues at Keck behind him, Isaacs proceeded in an international medical program, and finished ahead of schedule in 3 ½ years without incident.

52. His medical training included clerkship training at St. George's University London, Cleveland Clinic Florida and Mt. Sinai School of Medicine (NY). Dr. Isaacs received strong reviews, mostly honors, from supervising professors at more than twelve different clerkships at the aforementioned institutions.

53. Dr. Isaacs received his medical degree in 2010 after he scored a 99/99, placing him in the top decile on the highly competitive United States Medical Licensure Exam Step 1. The USMLE is administered by the NBME in Philadelphia, whose president is Dr Peter Katsufrakis. (See *Amended Complaint Exhibits* Page 64, Announcement of President Katsufrakis' NBME Presidency)

54. In July 2011, Isaacs was admitted to a federally funded Graduate Medical Education program ("medical residency") at Dartmouth Medical School, and their associated teaching hospital, DHMC/Hitchcock.

55. Within days of arriving at Dartmouth, Isaacs's health took an immediate and substantial turn for the worse. Previously able to work thirty hour surgery shifts, suddenly Isaacs had difficulty staying awake for more than three hours at a time.

56. Another resident, who Isaacs has never met to this day, sent a complaint to Dartmouth's Internal Medicine Program Director, Harley Friedman, asserting she heard about Isaacs' mistreatment and felt his supervisor, Dr. Khagi, should be replaced, and that Isaacs be given "necessary support."

57. Dr. Friedman wrote back to the complainant, dismissing her concern, and coercing her to turn on Isaacs. This evidences the beginning of Dartmouth's involvement in a longstanding pattern of predicate acts, by recruiting other individuals at Dartmouth to violate and suppress Isaacs's rights as a student physician.

58. Dr. Khagi ordered Isaacs to conduct two digital rectal exams (DREs) during his first 2-3 days of residency.

59. The exams were unnecessary for medical treatment. One patient had terminal metastatic cancer, and to this day, Isaacs recalls the patient's discontent when he was informed he needed a prostate exam to look for a "cancer source" per Dr. Khagi's instruction.

60. The exams were not for medical training.

61. The exams were meant to humiliate Isaacs for his past at Keck.

62. A plethora of other false situations were created for Isaacs. He was often left in silence as his supervisors watched him not knowing what to do in a new hospital, and purposefully failed to instruct him.

63. Dartmouth accepted federal funds to train Isaacs. Residency training is a privilege and right largely subsidized by the United States Federal Government. All fifty states require participation in federally funded residency training in order to obtain a medical license. The federal government allocates approximately $200,000 per year, per resident, to training facilities such as Dartmouth. A resident can expect upwards of USD$1 million invested by the government in his/her Graduate Medical Education program. The inherent value of this training exceeds the cost to the government. No other country spends anywhere near as much money as does the United States to train its physicians in residency. There are no residency programs directly run by the United States government; they are all outsourced to "academic medical centers" such as Dartmouth.

64. Dartmouth's schemes to humiliate Isaacs denied him any semblance of reasonable training. As such, Dartmouth benefitted inappropriately from receipt of federal funds, and deprived Plaintiff of the full inherent value of a residency.

65. Dartmouth learned about Isaacs' Keck enrollment and discipline. Dartmouth learned through John Doe, who they have refused to identify during seven years of related litigation.

66. At least six Dartmouth administrators, under oath in federal depositions, falsely stated they learned of Keck at the end of Isaacs' six months of internship employment, no earlier than January 2012.

67. These administrators committed perjury in order to shield claims against themselves and further the enterprise of harming Isaacs career and reputation. Had Dartmouth admitted they possessed knowledge of the sealed Keck records in June 2011, it would support the timeline alleged by Isaacs' claims of mistreatment. Thus, they chose to commit further predicate acts, submitting perjured testimony that they only learned about Keck in January 2012.

68. In fact, in early November 2011, Harley Friedman interviewed Isaacs's replacement from his same Caribbean medical program, one Jeremy Whyman MD. Until then, Dartmouth had never accepted a student from the Caribbean school.

69. Upon information and belief, no later than November 2011, Dartmouth sought Isaacs' medical records from Keck, the Caribbean, and other places he had studied. Both the interview and records request timing evidences the aforementioned perjury allegations.

70. Dartmouth directly communicated with the schools Isaacs had previously attended.

71. Dartmouth even emailed Isaacs' Wharton MBA program subsidiary in France to obtain records.

72. Dartmouth was obtaining these records to corroborate the information they had from John Doe concerning Keck.

73. John Doe provided the Keck student records directly to Dartmouth; it is unclear if they also sought direct confirmation of discipline from Keck, which, under FERPA, "nothing shall prohibit." John Doe provided Dartmouth with the Global Settlement Agreement, as it was in court records, but neglected to cite the Individual Settlement. There has been the suggestion that John Doe effectively duped Dartmouth into joining his retaliatory enterprise by omitting mention of the Individual Settlement, and the record sealing, from the information he conveyed. As a result, Dartmouth was convinced Plaintiff had "lied to them," and began the inappropriate actions described above.

74. Dartmouth was ultimately left with a dilemma of both having information about the sealed records, causing the ongoing situation of widespread mistreatment of Isaacs at his internship, and their knowledge in fact that their sealed legal status was improper to use against Isaacs. In short, the dilemma escalated over six months with Dartmouth unable to handle the situation in any ethical or legal fashion.

75. Dartmouth refuses to answer, despite years of discovery requests, how and when exactly they had learned that Dr. Isaacs attended Keck.

76. Around Thanksgiving 2011, one Jeffrey Simon MD told Plaintiff "I don't know what you did in your past, but you're right, they're trying to get rid of you."

77. On October 12, 2011, Dr. Isaacs completed an actigraph study with Dartmouth's Sleep Medicine program to document his inability to stay awake. The results of this study were that Dr. Isaacs was unable to stay awake for more than 3 hours at work due to hazing and mistreatment.

78. The results of this actigraph study would later disappear under questionable circumstances. Dartmouth violated numerous state and federal medical records and patient rights regulations when they intentionally deleted his sleep study.

79. The Plaintiff became aware of claims against Dartmouth early January 2012 for IIED and fraud, and informed Dartmouth that there would be a Federal lawsuit filed and that all evidence should be preserved.

80. Plaintiff made this request through an email letter to College President Jim Yong Kim, notifying him of pending litigation in the United States District Court. The email specifically indicated that all ESI evidence should be preserved.

81. The college had a duty under Federal Law to preserve relevant evidence and was noticed of this duty no later than January 15, 2011.

82. Despite that notice, the Plaintiff's computer and email accounts with Dartmouth Hitchcock Medical Center were disabled on January 17, 2011 and scheduled for deletion.

83. Isaacs noticed his account login was disabled and telephoned DHMC IT support on or around January 17, 2011.

84. IT support told Isaacs that his supervisors ordered the deletion of his electronic accounts.

85. IT support further informed Isaacs that automatic safety mechanisms were preventing the deletion for approximately another week.

86. Isaacs desperately emailed Finn, Jim Yong Kim, and others, pleading to reverse their order to destroy his electronic login and email access.

87. Finn was aware of Isaacs' litigation notice to Jim Yong Kim at the time she ordered deletion of Isaacs' electronic (eDH) files. (See Exhibit).

88. Finn had referenced the litigation and complaints to Jim Yong Kim in emails she sent to others in her department on or around January 15, 2012.

89. Finn and Kim, with coordination from Dartmouth attorneys, formed a consortium that worked to commit felonious evidence destruction.

90. There can be no doubt, *res ipsa loquitor*, that Finn and Jim Yong Kim purposefully and intentionally ignored Isaacs' pleas not to delete his eDH accounts.

91. Normally, an eDH account would only be deleted after an employee is properly terminated through due process including a fair hearing. As such, this email destruction occurred at least two months earlier than it should have.

92. The willful destruction of Isaacs' eDH accounts constitutes a felony under United States Code. 18 U.S.C 1519.

93. Dartmouth, via its attorneys, would later argue to the Court that automatic processes caused the destruction of Isaacs' eDH accounts.

94. Dartmouth knew that the felony code has exemptions for ESI deletions caused by automatic processes.

95. As stated, the only relevant automatic processes in this case were safety mechanisms to prevent the deletion of the ESI.

96. No automatic process caused the deletion of Isaacs' eDH ESI.

97. Dartmouth could have revoked Plaintiff's eDH access without destroying the emails; the destruction was simply not necessary nor legal unless he had been properly terminated.

98. Finn and Jim Yong Kim's decision to delete Isaacs' eDH files caused the deletion.

99. Dartmouth, via statements made by their attorneys, defrauded the Court by suggesting automatic processes were to blame.

100.     The deletion of Dr. Isaacs' electronic accounts severely limited his ability to support his well-founded claims in the District Court and in administrative proceedings. In other words, Dartmouth had an unwarranted victory in the District Court, and other venues, by destroying evidence.

101.     Dartmouth used fraudulent means and information to prevent the further discovery and prosecution of their felonious email destruction. For example, they claimed to recover Isaacs' emails by searching the outboxes of his correspondents, but omitted hundreds of emails from this purported search.   The email spoliation as described happened over an extended period of time requiring multiple conscious acts of obstruction; it was not an isolated event.

102.     Dartmouth terminated Isaacs in March 2012, without having ever placed him on formal probation. Probation is a due process guaranteed by various contractual and accreditation guidelines applicable to Isaacs' residency at Dartmouth. Defendant Finn and Kim sought to deny Isaacs this right.

103.     Dartmouth terminated Isaacs in March 2012, without having ever allowing him a "Fair Hearing" amongst Dartmouth peer physicians. "Fair Hearing" is a due process guaranteed by various contractual and accreditation guidelines applicable to Isaacs' residency at Dartmouth. Defendant Finn and Kim sought to deny Isaacs this right.

104.     Dartmouth terminated Isaacs in March 2012 by sending him a letter via US Mail, falsely accusing him of concealing his Keck records, and falsely accusing him of not disclosing other records from Arizona.

105.     Dartmouth knew the Keck records in fact had been expunged. Dartmouth had an absolute, unfettered right via FERPA to confirm or deny the expungement of the Keck

records. Dartmouth nonetheless sent the false letter via US Mail , which constitutes Mail Fraud under the United States Code.

106.     At least one civil federal lawsuit was concluded adversely to Plaintiff, as a result of Dartmouth defendants submitting knowingly false and fraudulent information to the court. One such case was in the New Hampshire district, lawsuit CV-12-40-LM. To the extent any further *res judicata* claims prevailed, Dartmouth had unwarranted victories in additional processes. Judicial notice of that decision, and third party employment decisions based upon the obstructed civil lawsuit, have caused further direct damages to Plaintiff financially and reputationally.

107.     That lawsuit alleged that Plaintiff had become medically impaired from mistreatment at Dartmouth. The lawsuit concluded with summary judgment which did not include the spoliated evidence. Plaintiff's own medical providers formed erroneous diagnoses based upon the outcome of the litigation & his employment termination. Defendants' perjury of key dates and destruction of emails had a real and long lasting impact, even affecting how medical providers would view Plaintiff's distress (i.e. whether or not it was due to IIED versus another medical cause).

108.     Nothing in the summary judgment declared that Isaacs was permanently barred from federally funded residency training, nor that his future applications to Dartmouth should not be given all due consideration.

109.     Indeed, uncontested witness statements in that lawsuit's record included senior program directors' statements that "Isaacs medical knowledge was perfectly acceptable," and that "his reviews were quite positive." Isaacs primary supervisor (representing 80% of his clinical time at Dartmouth, aka his non-call time), Dr Donald West, gave him an

outstanding performance review. Plaintiff's duties were either on-call or non-call. Dr West represented the entire assessment of non-call, and as stated, passed him with good marks. Plaintiff's last on-call assessment was by Dr Cynthia Schwartz, who passed him with good marks. Dartmouth would rely on a fabricated on-call incident, per Dr Riblet, to bring performance complaints against Isaacs. Hence, but for fabricated reports, Isaacs had good marks and passed his assessments at Dartmouth.

110.     In a deposition, Dr Christine Finn testified that she would "defer to the AAMC" and other competent authorities, with regards to interpretation of the Keck settlements. She never did.

111.     The NHES, New Hampshire Employment tribunal determined that Isaacs non-disclosure of Keck records was permissible, because he believed it to have been expunged.

112.     Similarly, the AAMC closed an investigation, in Isaacs' favor, upon legal review of the Keck settlements.

113.     Dartmouth and the NH Board of Medicine (see below) defied two prior competent authorities, when they faulted Isaacs for non-disclosure of Keck.

114.     Under an applicable standard of willful falsification and gross misrepresentation, Dartmouth and the NH Board incorrectly faulted Isaacs for interpreting the Keck settlement agreements the same way as the AAMC and NHES.

115.     In other words, they continue to accuse Isaacs of dishonesty for adhering to the two settlement agreements using reasoning accepted by the AAMC and NHES.

116.     At the conclusion of cv-12-40, Isaacs believed that despite the setback at Dartmouth, he still had a future medical career. Commonly, resident physicians who

suffer medical ailments forcing them to abandon a medical residency, are then permitted to return to federal GME training after being rehabilitation. Hence after cv-12-40's MSJ, there existed no reason Isaacs could not hope and expect he would at some point be able to return. This was especially true after Finn's deposition agreeing to accept the AAMC outcome.

117.    However, years of applications to Dartmouth and appeals of the NH Board false orders have made it apparent that the Defendants succeeded in permanently barring Isaacs from residency and licensure.

118.    It is exceptionally rare, if not unheard of, for someone with Isaacs credentials, and no criminal record or other bar to employment, to be kept out of training for seven years.

119.    Indeed, Dartmouth didn't even acknowledge receipt of Isaacs most recent application to GME for the 2019 academic year. Such treatment evidences Dartmouth's vendetta against Isaacs ever becoming a doctor. They accepted application fees but never honestly considered his application, for six years in a row.

120.    Dartmouth attorneys have responded that Isaacs cannot "resuscitate claims against Dartmouth by reapplying each year." Such a statement means that Dartmouth does not welcome Isaacs' 2018 application to their federally funded program.

121.    In June 2019, in this very action, DHMC's own attorneys declared (MTD p.11) that "Plaintiff continues to set himself up for rejection by re-applying for residency." Dartmouth acts as an arbiter of federal funds, each and every year, for independent and new applications to their program. Moreover, Plaintiff submits an application fee, each and every year, for a new independent application to GME at Dartmouth. On at least two different occasions, DHMC's attorneys have suggested that his application is a waste,

that it will not be considered, that he will not even receive an application acknowledgment. It matters not if Plaintiff's health has changed, or if their own Director Finn declared she would "accept the AAMC determination" re Keck. Dartmouth has decided it will retain Plaintiff's application fees, and federal funds to act as a fair arbiter and gatekeeper to the residency application process, but will not consider the application as a new, independent event. They will rely on their retaliatory stance – and regular way of doing business dating back to 2011 – bar Plaintiff at all costs from their federal program.

122.    Such statements declare that Dartmouth believes Isaacs should be permanently barred from federally funded GME medical training at their facility, despite being qualified. This amounts to illegal retaliation against Isaacs, in violation of federal witness retaliation laws. Likewise these continual denials of access evidence an overall open-ended scheme, pursuant to RICO, to retaliate against the Plaintiff for making civil and criminal complaints against members of their enterprise, or possessing evidence supporting such claims.

123.    Plaintiff's 2019 application to residency at Dartmouth is a new, independent application.

124.    It warrants consideration of the facts at time of application, i.e., in 2019.

125.    Even if a 2011 determination was correct (it wasn't) that Plaintiff incorrectly withheld Keck from his 2011 application, a 2019 application should look at all new facts that may have changed since 2011 to determine Plaintiff's candidacy in the 2019 application.

126.     Plaintiff's 2019 application to Dartmouth is honest and forthcoming, in light of rather complex settlement ramifications.

127.     As a result, Plaintiff's application to 2019 at Dartmouth could be approved, by an unbiased and impartial arbiter/gatekeeper of federal funds who determines past performance and honesty concerns were either remedied, rehabilitated, or historically incorrect/out of proportion.

128.     Furthermore, an impartial arbiter who had been made fully aware of the content and circumstances of 1) deleted Dartmouth emails, 2) perjured Dartmouth testimony, and 3) Jim Yong King's recent resignation would be especially likely to re-admit Plaintiff, acknowledging he was never given a fair chance at residency.

129.     Similar to the termination letter sent to Plaintiff, Dartmouth caused a false letter to be sent to the New Hampshire Board, where they knowingly propogated false/expunged records from Keck.

130.     Dartmouth's materially false letter to the NH Board, disguised as FERPA-proper educational records, constitutes Mail Fraud under United States Code. Dartmouth knew Keck should not release the sealed discipline history; they chose to send the sealed and annulled records directly to  the NH Board of Medicine.

131.     The NH Board received the Keck information and immediately assigned the matter to Defendant Cahill. Cahill, in 2013, telephoned Isaacs and said "Just so you are aware, this was placed on my desk from someone above. I don't want to make a mountain out of a molehill."

132.     Dartmouth had recruited individuals at the NH Board to scheme and defraud, and retaliate against, Isaacs.

133.    Cahill made no less than six attempts, over two years, to coerce Isaacs to settle. In one email, he even said "I don't think this will affect your lawsuit with Dartmouth," but that he "needed" Isaacs to admit wrongdoing via Keck.

134.    The New Hampshire Board of Medicine (the "Board") found that Dr. Isaacs had improperly failed to disclose his "criminal stalking" and Keck enrollment on his residency application.

135.    Setting aside its incorrect claim that Dr. Isaacs had a criminal record, which he did/does not, the Board not only rejected Dr. Isaacs' reliance on the settlement agreements but also disclosed the facts of the Keck circumstances contained in documents that the agreements had sealed.

136.    In so doing, the Board violated the court-entered settlement agreements and, worse, forever tarnished Dr. Isaacs' reputation.

137.    The Board withheld critical exonerating evidence from the public, namely, the first Keck settlement agreement.

138.    The Board falsely stated to the public that "there is no provision sealing the records."

139.    The Board also declared that, upon information and belief, USC failed to complete their end of the settlement agreement, specifically, they failed to release any outstanding administrative charges.  Releasing outstanding administrative charges was one of the plain-text requirements of the second Keck settlement agreement.

140.    If true, Defendant USC's failure to release administrative charges against Isaacs represents an additional predicate act of obstruction of justice and/or due process violations.

141.     Counterintuitively, the Board blamed Isaacs for USC's failure to release administrative charges, despite conceding that USC had breached their contractual duty.

142.     Such an argument goes beyond mere error, and represents Cahill and the Board's ongoing attempt to participate in the predicate acts and scapegoat Isaacs. The Board order itself evidences a *mens rea* to join and please the enterprise formed by the Defendants.

143.     Cahill's statements evidence his intention to obstruct justice and due process by issuing false statements and withholding key evidence from a state proceeding.

144.     To date, the Board's only defense, argued in recent federal court motions, is that there was "no clearly established right" for Cahill to include the Keck settlement exonerating evidence in his order. In other words, the Board doesn't contest their Order is false. They merely contest that Isaacs had any due process right to a true Order, or an order that took into consideration evidence favorable to Isaacs.

145.     Further evidencing their involvement in the enterprise, the Board failed to investigate Khagi for the unnecessary DREs he ordered. Plaintiff sent repeat requests for investigation, over a two year period, only to be ignored.

146.     By ignoring their duty to investigate any of Isaacs' claims, and issuing knowingly false documents against him, the NH Board, via its officers, repeatedly obstructed justice and denied Plaintiff due process, in the act of joining the co-Defendants efforts to end Isaacs' medical career.

147.     In mid-2014, the Board first published the above false orders on the internet, and national medical board sanction action databases/clearinghouses. The Board continues to publish these documents in 2019. The Board is aware they contain materially false and damaging information.

148.    As a result of false declarations of "stalking crimes," the years following 2014 publication, Isaacs became further ostracized from former colleagues, friends, neighbors, and even had AirBNB reservations cancelled.

149.    Despite being reasonably optimistic that justice would prevail in a timely fashion, over time, Isaacs had to reasonably conclude that the actions of the Board and other Defendants permanently ended his medical career and caused severe reputational harm.

150.    It would be unrealistic and unfair to have expected Isaacs to have fully realized this injury in 2014, at the first instance of publication of a related order. Indeed, Isaacs never reasonably anticipated an appeals process where the Board would admit their Order was false, but not retract it. In 2014, Isaacs still reasonably believed that ultimately the truth behind his settlement agreements would prevail, and that he would ultimately graduate from a GME program.

151.    Reputational and career harm of this magnitude are extraordinary and took months to years to fully process and understand the implications thereof.

152.    Isaacs has applied to Dartmouth's residency program for each year inclusive, 2013, 2014, 2015, 2016, 2017, 2018, and 2019.

153.    The co-Defendants wish to permanently prevent Isaacs from ever being a practicing physician, despite Dartmouth's own Dr Friedman and Dr West testomony that Isaacs had "good" medical knowledge and was a good resident, respectively. As such, they have not considered seven separate residency applications over seven years, as they have a duty to do as arbiters and operators of a federal training program. Each residency refusal is an illegal retaliation under 18 U.S.C. § 1513, and/or other anti-retaliation laws.

154.     Likewise, each and every adverse event referenced above is an illegal retaliation, deprivation of due process, and or obstruction of justice intended to thwart a 2007 federal court ordered settlement agreement, a 2012 New Hampshire United States District lawsuit, or other related processes and appeals and law enforcement complaints.

155.     Plaintiff has been prevented from discovering the full scope of predicate acts via federal discovery because of Defendants willful obstruction of discovery law.

156.     RICO has both civil and criminal causes of actions. Plaintiff seeks both civil and criminal prosecution of the herein described RICO violations. Plaintiff has properly noticed the Department of Justice of these civil and criminal RICO claims.

157.     Jim Yong Kim offered his resignation from his appointment as President of the World Bank, upon information and belief, after certain government entities raised questions pertaining to the violations detailed herein. Kim's resignation, in part or in whole, provides new information that substantiates and/or confirms Plaintiff's allegations of fraudulent concealment and evidence spoliation. New evidence that Defendants employed fraudulent means to spoliate evidence and offer false testimony prohibits further *res judicata* dismissal of Plaintiff's fourteen year claims that he has a right to participate in federally funded medical training.

158.     The NH Board of Medicine only recently declared that despite Cahill's clear error in withholding the first settlement agreement, they would not correct the record because there was no "clearly established right" for Plaintiff to have due process and a true public board order.

159.     As a result of the aforementioned fraudulent concealment, and lengthy delays in the previous related lawsuits, the full nature of Plaintiff's injuries have been difficult to precisely ascertain.

160.     A jury shall determine that Dr Isaacs' currently cannot practice medicine as a result of a pattern of illegal, retaliatory behaviors initiated by John Doe in connection with Keck, spanning over fourteen years, and ultimately involving Dartmouth and the NH Board officers.

## V.     CAUSES OF ACTION

### COUNT I
### DECLARATORY JUDGMENT

161.      Plaintiff repeats and re-alleges each and every allegation contained herein as if fully stated under this count.

162.     There exists a genuine and bona fide dispute and an actual controversy between the parties as to the obligations of Keck under the Individual Settlement and Global Settlement agreements.

163.     Pursuant to the Uniform Declaratory Judgment Act, Plaintiff in good faith requests that the Honorable Court declare the following:

(a) Plaintiff and Keck formed the two settlement agreements over a two year period, with particularity and due consideration given to each and every term in the agreements.

(b) Keck and the Plaintiff had brought cross allegations and charges that the settlements were meant to dismiss. The charges against Plaintiff were "failure to demonstrate  the

Essential Characteristics" of a Keck student physician. The charges against Keck and the Individuals included abuse of power, bribery/favoritism, and retaliation.

(c) Plaintiff's only consideration in the Individual Settlement was the sealing of his Keck disciplinary records, i.e., the SPC administrative charge of not maintaining "Essential Characteristics" that formed the basis for his expulsion.

(d) The parties did not cite any statutory authority defining sealed academic records, and indeed, none are known to exist.

(e) The plain intent of sealing the records, evidenced by email communications, was for Keck to "remove any burden on Plaintiff to disclose these events in future" medical career endeavors.

(f) In other words, Keck agreed to render "factual innocence" to Plaintiff in exchange for his dismissal of the case against Katsufrakis, Henderson, and Baughman.

(g) "factual innocence" and exoneration are applicable in respective California Penal Code, and may be analogously applied here to academic administrative charges.

(h) The law permits two private parties great authority and breadth to contract with one another in freedom. USC, a private institute, was permitted to contract to "factual innocence" and "exoneration" of Plaintiff, in recognition of possible wrongful determinations by their faculty, and they did so.

(i) The American Academic of Medical Colleges and New Hampshire Employment Security tribunal were the first competent authorities to review this matter.

(j) Both entities determined that the settlements were consistent with "factual innocence" and/or exoneration, and permitted Plaintiff's non-disclosure of the aforementioned charges.

(k) These two determinations were fair and reasonable.

(l) Keck legally contracted with Plaintiff to afford him "factual innocence" and to allow him to put the matter, as a matter of fact and law, behind him.

(m) The Global Settlement agreement, redundantly, acquitted Plaintiff of the aforementioned charges.

(n) The Global Settlement agreement, redundantly, dismissed Plaintiff of any administrative charges, including that of unprofessional conduct.

(o) Under both Settlement Agreements, it would be a breach for USC/Keck to disclose the charges as if they hadn't been discharged, rendered "factually innocent," or otherwise impede on the intent of the settlements.

(p) The Global Settlement agreement annulled all contracts between the parties, including the enrollment agreement.

(q) A party such as the Plaintiff is allowed to disavow the existence of an annulled contract, in this case, enrollment.

(r) On the day the Global Settlement was reached, USC examined the issue of Plaintiff's disclosure liabilities to third parties regarding academic enrollment history.

(s) The settlement stated that USC agreed that Isaacs need not disclose any of the USC Keck discipline or academic enrollment history to any third party.

(t) The effect of the two settlements renders Isaacs enrollment and discipline at USC Keck a legal nullity, as Attorney Michael Payne testified in 2011.

(u) By not listing USC discipline or enrollment history on related applications, Isaacs was complying with the intent of the settlement agreements, the legally permissible

effects of the settlement agreements, and furthermore, academic advice from USC contained therein.

## COUNT II
## Breach of Contract
### (Keck Defendants)

164.    Plaintiff repeats and re-alleges each and every allegation contained herein  as if fully stated under this count.

165.    Plaintiff and Keck entered into two contracts, the Global and Individual Settlement agreements.

166.    Plaintiff complied with the agreements, believing they had been court enforced and valid. As a Caribbean applicant to residency, disclosing Keck attendance may have helped his applications, but nonetheless, he did not disclose any of the matter to third parties.

167.    Keck was obliged under the agreements to annul their prior contracts with Plaintiff.

168.    Keck was obliged to dismiss administrative charges, including the SPC charge of unprofessional conduct.

169.    Keck was obliged to acquit the plaintiff of all charges.

170.    Keck was required to seal disciplinary charges, rendering Plaintiff "factually innocent."

171.    The NH Board of Medicine found "no evidence" Keck dismissed administrative charges against Plaintiff in 2014. The Board order, containing many inaccuracies, was appealed and cert was denied in June 2015. At that point in time, Plaintiff became

reasonably suspicious, and informed, that Keck was not complying with the Settlement Agreements.

172.     Keck has never taken action to comply with the settlement agreements.

173.     The Keck registrar was never informed to make the necessary changes to Plaintiff's student record, including dismissal of admin charges and sealing the charges.

174.     The aforementioned breach directly and proximately caused Plaintiff severe property loss, emotional distress, reputational and career harm, and physical stress and harm.

175.     Plaintiff became aware that this breach was intentional in May 2019.

176.      Attorney Keith Mathews spent three months between April and June 2019 attempting to mediate with Keck concerns that Keck not fully complied with the settlement. Keck was asked to "resolve any breaches and assist in repairing the residency training dismissal that resulted from the breach." Keck Counsel Meyer wrote back that "USC declines" to resolve the breach or assist and mitigating damages.

## COUNT III
## IIED
### (All Defendants)

177.      Plaintiff repeats and re-alleges each and every allegation contained herein as if fully stated under this count.

178.     Plaintiff has suffered severe emotional distress as a result of Keck's willful choice to dishonor their settlement contracts.

179.     If there was any doubt as to Keck's intent, Counsel Meyer clarified that in his email refusing to look into Keck's breaches.

180.     Wanton disregard for complying with a court ordered settlement contract, let alone a physician's career being needlessly after over a decade, is reckless and intentional behavior.

181.     Counsel Meyer's recent action is extreme and outrageous. A reasonable individual informed of Plaintiff's ten year difficulty complying with the settlement agreement would not respond the way Counsel Meyer did.

182.     Counsel Meyer quite simply refused to accept information about the breach in ADR, meditation, or otherwise, and refused to comply with the settlement agreement.

183.     Meyer stated USC "declined" to correct the breaches.

184.     Moreover, USC counsel Fogelman acts as if the two settlement agreements simply don't exist; in a recent Pleading, he said "USC did not cause Plaintiff's omissions [of disciplinary charges]," as if the charge records had never been sealed and dismissed and acquitted.

185.     In a civilized community, it is not tolerated to retract an agreement and act as if it doesn't exist, particularly when the agreement caused an individual to rely upon said agreement and undertake four years of medical school to only be effectively barred from the practice of medicine.

186.     Keck has taken these actions for the purpose of causing Dr. Isaacs emotional distress.

187.     Dartmouth has refused to even consider Plaintiff's application to federal GME, on the basis of "dishonesty" regarding his compliance with the Keck agreements.

188.     Dartmouth's declaration in July 2019 that Plaintiff's re-applications are "setting Plaintiff up for rejection" evidences new and improper emotional abuse, incorrectly

stating that Plaintiff has some honesty deficiency that in no way could warrant admission to their program.

189.      Refusing to consider an individual from a government program, in perpetuity, because he is simply complying with a federal court ordered settlement agreement is unconscionable in and of itself.

190.      Likewise, the NH Board has decided to, in perpetuity, publish the contents of "factual innocence" on their website and national clearinghouses.

191.      As a result of these actions Dr. Isaacs has suffered distress, including a myriad of stress related conditions, sleep issues and other medical concerns.

## COUNT IV
## NIED
### (Keck Defendants)

192.      Plaintiff repeats and re-alleges each and every allegation contained herein as if fully stated under this count.

193.      To the extent some individual at Keck were not aware of their obligations inherent in the settlement agreements, such as the registrar's office, they are liable under the NIED doctrine.

194.      Keck had a duty to comply with the settlement agreement.

195.      This duty was breached and Plaintiff became aware of the breach around June 2015, pursuant to the NH Board declaration thereof.

196.      Keck continues to recklessly, intentionally, and/or negligently disregard its obligations to Plaintiff.

197.     The negligent actions of Keck officials, such as the registrar's office, and failures in their official duty to comply with a court ordered settlement agreement have proximately caused Plaintiff's emotional distress.

<u>**Count V**</u>
<u>**Bivens Implied Cause of Action**</u>
**(Keck and Dartmouth Defendants)**

198.     Plaintiff repeats and re-alleges each and every allegation contained herein as if fully stated under this count.

199.     Plaintiff has been actively denied participation in federally funded GME training programs operated by the Defendants. Plaintiff has top decile credentials, no criminal record, "good medical knowledge" and was a "good resident."

200.     The clear reality is that these residency programs have permanently blocked Plaintiff's enrollment because, over a decade ago, he raised civil and criminal charges against a prominent Dean and scientist.

201.     The Defendants employ Program Directors to make residency hiring decisions. In turn, these Program Directors act as arbiters of federal training funds. Though employed by Defendants, they are also federal officials who have been delegated the important responsibility of appropriating federal training funds to duly qualified individuals.

202.     The Program Director's refusal to admit Plaintiff, on the basis of his being a witness and filing law enforcement referrals, constitutes a violation of both his Due Process and First Amendment rights.

203.     Under Bivens, the Court is permitted to exercise an implied cause of action against a federal official, the Program Director, who violates Plaintiff's constitutional rights. Because there exist no GME programs directly administered by the government,

and because Plaintiff is being blocked from federal GME funds in an unconstitutional and retaliatory fashion stemming from his federal claims against an NIH director, a Bivens claim may proceed.

204.     In addition to due process and First Amendment rights, the right to practice an occupation is a liberty interest protected by the 14th Amendment of the United States Constitution. Gibson v. Berryhill, 411 US 564 (1973).

205.     Dr. Isaacs was entitled to due process before he was barred unlawfully by these Defendants from practicing his chosen profession.

206.     Damages for seven years of refused GME training and injunctive relief to allow Plaintiff's GME to proceed  are allowable and appropriate in this Bivens claim against a federally funded residency Program Director.

## Count VI
## Intentional Interference With Contractual Relations
### (John and/or Jane Doe, NH Board)

207.      Plaintiff repeats and re-alleges each and every allegation contained herein as if fully stated under this count.

208.     Contracts existed between Plaintiff and Keck, namely the Individual and Global Settlement agreements.

209.     John Doe knew of these settlements. They were located in court records, and in all probability, John Doe negotiated these settlements as client to USC Counsel Dal Soglio.

210.     Dartmouth has confirmed they learned about Plaintiff's Keck academic and disciplinary records via John Doe. In other words, Dartmouth concedes they learned about the records, but refuses to name the source.

211.     By communicating Plaintiff's Keck records to Dartmouth, John Doe deliberately

defeated the purpose of the agreements, namely, to limit disclosure requirements and

absolve Plaintiff of future reputational and career harm.

212.     Plaintiff was harmed, as the disclosure triggered the formation of an illegal

enterprise, the inappropriate termination from federally funded GME, the inappropriate

loss of his medical license, the publication of sealed facts, emotional distress, and

workplace harassment.

213.     But for John Doe's transmission of the sealed records, none of the aforementioned

injuries would have occurred. John Doe provided additional continuity of the enterprise

by  recruiting Dartmouth to join USC's retaliatory cause, and serving as a link from

USC's custody and control of student records to Dartmouth's.

214.     Plaintiff has worked tirelessly with multiple attorneys and law enforcement to

ascertain the identity of John Doe, but at this point in time, cannot attest to his identity

without the aid of further discovery.

215.     Similarly, the NH Board of Medicine has chosen, despite being notified in

numerous processes, to publish a fake order to the public, which is meant to defeat

Plaintiff's consideration vested by the settlement agreements.


## COUNT VII
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO)
## 18 U.S.C. § 1962(c)
### (All Defendants)

216.      Plaintiff repeats and re-alleges each and every allegation contained herein as if

fully stated under this count.

217.     This case describes a small group of individuals with a nexus as academic medicine leaders who generally trained together , worked together, or had other ties to leading medical institutions including the National Institutes of Health, NBME, Dartmouth Medical School, and others, and, owing to a personal vendetta, coordinated predicate acts over more than a decade to successfully ruin the Plaintiff's medical career and reputation.

218.     In their small world controlling billion dollar NIH grants and coveted California and Ivy league medical school spots, they successfully recruited new actors each time Plaintiff went to a new institution where they had influence. They subverted institutional policies and generally pulled strings, as evidence will show, without having to answer to anyone for years, until, upon information and belief, at least one branch of the United States government began to ask questions.

219.     RICO's reach is broad and includes otherwise law-abiding businesses and persons who violate its provisions. (*Sedima, S.P.R.L.* v. *Imrex Co., supra,* 473 U.S. at pp. 499-500 [87 L.Ed.2d at pp. 360-361]; *Cianci* v. *Superior Court, supra,* 40 Cal.3d at pp. 908-909.) Gerase v. Superior Court, 31 Cal. App. 4th 1218, 1229 (CA 3rd 1995).

220.     As defined by RICO, the Defendants formed an enterprise under at least one of several parallel, non-exclusive theories. First, the Defendants all participated in, and made a living from, federally and state funded medical training allocations that included Plaintiff's share of funding. They were "arbiters and gatekeepers" responsible for allocating taxpayer dollars to medical students, in this case, the Plaintiff. Second, the Defendants all had a reputational and commercial stake in the national health care provider network that was under scrutiny by claims Plaintiff made against them and/or

their cohorts. Third, all Defendants had some stake in, or authority over, Plaintiff's medical and/or professional career as his professor, dean, attending, or likewise. Fourth, all Defendants had authoritative control and or publishing rights in nationwide medical training databases, as "academic medicine competent authorities", including board licensure & reprimand databases which now contain false, retaliatory information. Fifth, all Defendants directly had some nexus as Dartmouth, Keck or Harvard Medical School faculty, alumni, and/or professional liaisons. Finally, the Defendants formed a *de facto* enterprise with the sole purpose of carrying out a vendetta and negatively impacting Dr. Isaacs's medical-professional career. Per United States v. Turkette, 452 U.S. 576, 583 (1981), where the court upheld a RICO conviction even though the only purpose of the enterprise was to engage in a pattern of racketeering activity.

221.     The acts of the Defendants persisted over an extended duration and recruited new individuals for functional continuity and pursuit of goal. The Plaintiff alleges each Defendant independently, and all Defendants collectively, violated the Act. More specifically, each Defendant ultimately engaged in a pattern of predicate acts meant to retaliate against Plaintiff's filing of evidence and claims in official proceedings against them. The enormity of the violation is best appreciated, however, when the combined joint enterprise efforts are viewed over the entire fourteen year period.  For clarity and exemplification, although Dartmouth defendants didn't participate in the enterprise years 2006-2011, once they were recruited, they acted both in full concert with the prior enterprise, and as their own enterprise for new claims. To the extent declaratory judgment of the disputed and breached settlement finds waiver of 2005-2007 activity, the RICO claim goes on for the remaining predicate acts.

222.    The RICO Defendant(s) have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through a pattern of racketeering and activity described herein, in violation of 18 U.S.C. § 1962(c).

223.    The Defendants committed numerous predicate acts, spanning no less than twelve years, which constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

224.    Defendants used their knowledge of complex federal medical training norms to evade scrutiny, in what one witness describes as "experts in medical training standards….threw down a spike as a long term impediment" in Plaintiff's career. For example, as the operators (in the case of Katsufrakis) of national clearinghouse databases, the working of which cannot be fully known prior to discovery, Defendants have been able to sabotage Plaintiff's career and reputation through complex publication and dissemination channels.

225.    Representative predicate acts are enumerated below for each defendant. This list is not exhaustive and shall be refined during discovery. Predicate acts have likewise been pleaded earlier in this complaint. Certain predicate acts may be deemed moot after declaratory judgement of the settlement agreement terms and disputed breaches.

226.    This Amended Complaint enumerates substantial civil and criminal complaints ("law enforcement complaints" that Plaintiff filed against Defendants, forming the core basis for a retaliatory enterprise under witness retaliation and obstruction of justice laws (see below). Each wrongful deprivation cited in this Amended Complaint may be in retaliation for one or more law enforcement complaints. For example, Plaintiff's initial "Zilkha United States District Court" cover sheet served as evidence in an official proceeding , that Keck was aware of, took steps to prevent and to intimidate Plaintiff

from further dissemination, and likewise motivated retaliatory events against him including breach of settlement contracts, as well as the initial SPC discipline. Likewise, Dartmouth's refusal to conduct a fair hearing, and their 2019 open ended refusal to consider Plaintiff's applications, exists in retaliation for law enforcement referrals including DOJ/FBI notice of evidence spoliation. It additionally extends to the original Zilkha cover sheet, to the extent John Doe recruited Dartmouth. A non exhaustive list of law enforcement complaints that Defendants possessed knowledge of prior to committing predicate acts includes: 1) the Zilka cover letter, 2) the 2006 CACD civil action and related complaints of illegal activity, 3) numerous letters to Defendants and their counsel indicating violations of civil and criminal code, 4) 2013 motion for referral to US attorney of evidence spoliation, 5) 2012, 2014 and subsequent referrals to DOJ and FBI, 6) January 2012 referral documents to Dartmouth risk management and ethics committees, 7) various other complaints to local, state and federal authorities, such as EEOC, Office of Civil Rights, and NH State Police.

227.    The predicate acts described in this complaint all violate one or more of the following federal statutes:

    a.  18 U.S.C. § 1513 (hereafter "witness retaliation"), which forbids conduct that "damages the tangible property of another person, or threatens to do so, with intent to retaliate against any person for-- the attendance of a witness or party at an official proceeding, or any testimony given or any record, document, or other object produced by a witness in an official proceeding; or, Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for

providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, …Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, shall be fined under this title or imprisoned not more than 10 years, or both."

b.  18 U.S.C. § 1503, (hereafter "obstruction of justice"), which forbids obstruction of process, generally, including actions taken "corruptly" to "influence, obstruct, or impede the due administration of justice." Under the omnibus clause of this statute, obstruction of justice claims may be bought for attempts to impede Plaintiff's federal civil and criminal charges, claims, causes of action, or allegations. Without limitation, this includes attempts to discredit Plaintiff, wrongfully discipline him, delay or prevent discovery, and disavow or dishonor settlement or contractual responsibilities.

c.  18 U.S.C. § 1512, (hereafter "witness tampering"),  Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to— influence, delay, or prevent the testimony of any person in an official proceeding (2)cause or induce any person to—withhold testimony, or withhold a record, document, or other object, from an official proceeding; alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding; evade legal process summoning that person to appear as

a witness, or to produce a record, document, or other object, in an official proceeding;

d.  18 U.S.C. § 1343, (hereafter "wire fraud"), forbids any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice. Per statute, this shall include any scheme to deprive another of honest services.

e.  18 U.S.C. § 1341, (hereafter "mail fraud"), forbids any scheme or artifice to defraud .. by means of false or fraudulent pretenses, representations, or promises … for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service.

I.  **Dartmouth Defendants/ Jim Yong Kim**

228.  The factual history describes a pattern of adverse actions taken by Dartmouth and Jim Yong Kim meant to interfere with Plaintiff's livelihood and property. Predicate acts began as soon as Isaacs arrived at Dartmouth for training in July 2011. Specifically, through the unknown communication with John or Jane Doe, Dartmouth began to retaliate against Isaacs for his complaints against Keck and the NIH. Plaintiff was, and should have been, protected from such treatment pursuant to federal witness retaliation code (see, supra). Based upon information and belief, John Doe formed a nexus and

enterprise with Dartmouth officials which jointly retaliated against Plaintiff. No later than January 2012, Isaacs had commenced federal proceedings against Dartmouth itself. Adverse actions which occurred after January 2012 violated witness tampering and obstruction of justice statutes, in addition to witness retaliation code.

229.     Representative actions violating these statutes have been described in the factual history. Such actions include, but are not limited to, ordering Isaacs to conduct unnecessary prostate exams, silencing other staff who spoke out against mistreatment, blatantly depriving Isaacs of institutional due process,  and falsely accusing Isaacs of medical mistakes and errors. Each of these acts was meant to retaliate against a federal witness, and/or interfere with a proceeding, in violation of the cited statutory authority.

230.     Once Isaacs notified Dartmouth of pending federal litigation, his emails were deleted by Jim Yong Kim or Christine Finn. A warning that emails were being deleted was ignored by Jim Yong Kim. As such, Kim either assented to, or directly ordered, the email destruction. Isaacs' medical records were also destroyed during the same month in January 2012. Isaacs was denied a fair hearing later in 2012, as required by hospital bylaws. Based upon the proximate sequence of retaliatory events following Defendant Kim's receipt of a federal lawsuit notice, evidence shows he either ordered, or assented to, separate acts of email destruction, medical records destruction, and multiple internal due process violations. Dartmouth College and DHMC are legally culpable, having assented to these improper actions carried out by Kim and other administrators.

231.     Multiple instances of evidence spoliation form the basis of a pattern of predicate acts that violated federal witness tampering and obstruction of justice laws. The Dartmouth defendants took repeated steps, over an extended period of time, to destroy

the written record of evidence that was be critical to litigation due process in the federal courts. Plaintiff did not receive due process in prior lawsuits and administrative processes as a direct and foreseeable result of criminal witness tampering and evidence destruction. This caused direct injury in that Isaacs could not recover his residency stipend and inherent residency training value. Had the witnesses not perjured themselves, evidence would have existed that would have certainly resulted in a judge or jury re-admitting him to GME at Dartmouth.

232.     In March 2012, a NH process server noted that Jim Yong Kim appeared to have evaded summons service by issuing false statements. Such activity constitutes a willful and deliberate pattern by Dartmouth defendants to violate federal witness tampering and obstruction of process laws.

233.     During a dozen depositions of Dartmouth physicians taken in 2012-2013, not a single witness was able to recall or describe how they learned about Plaintiff's sealed Keck records. Likewise, most witnesses outright denied, falsely, any knowledge of the sealed records. Similarly, key witnesses had no recollection of the reasons why they ordered Plaintiff to conduct the unnecessary prostate exams. Discovery will produce a detailed register of false statements made by Dartmouth defendants meant to obstruct justice and tamper with witnesses. Plaintiff has been unable to obtain correct closure of this matter as a direct and foreseeable result of Dartmouth defendants witness tampering and obstruction of justice.

234.     As part of their enterprise, Dartmouth entered false statements into interstate computer systems. For example, Dartmouth entered false reasons for termination, and false information about Keck, into interstate computer systems. During a deposition of

one Natalie Riblet, Riblet challenged the authenticity of one such purported incident entered into these databases. Such false entries constitute wire fraud, per the above referenced authority.

235.    Likewise, Finn transmitted false letters to the NH Board of Dartmouth, Isaacs, and others via US Mail. The documents contained knowingly false information about expunged falsities from Keck. These actions constituted mail fraud as per the above referenced authority. More specific mail and wire fraud pleading requirements will be met once discovery yields the proprietary documents.

## II.    <u>Dartmouth, New Hampshire Board of Medicine</u>

236.    The NH Board of Medicine engaged in multiple actions in violation of federal obstruction of justice code, federal anti-retaliation code, and wire and mail fraud statutes:

237.    First, the Board refused to investigate reports of felonious sexual assault, namely, that Khagi ordered him to conduct unnecessary prostate exams, solely for the intent to retaliate against Isaacs for his non-disclosure of Keck. To this day, the Board has not investigated the exams. A proper investigation would have been critical to refer the matter to appropriate authorities, and/or take Board action against Khagi and Dartmouth.

238.    The Board, specifically investigator Jeff Cahill, withheld exonerating evidence – the Keck Settlement agreements – and revoked Isaacs medical license for non-disclosure of the annulled Keck records. They did so with intent to obstruct justice and due process in both their own hearing and related federal lawsuits. They did so to appease and work in conjunction with the enterprise that formed between them and Dartmouth; Cahill told Plaintiff by phone that he had been instructed by a superior to take on the false allegation. The Board also retaliated against Isaacs because he had named them in a PAED lawsuit

in 2013. To this day, the Board falsely publishes on nationwide databases that the Keck agreements do not exist.

239.    The Board even went so far as to blame Isaacs for Keck's failure to retract administrative charges, which Keck was contractually bound to do from the settlement agreements.

240.    The Board went ahead with a hearing despite the fact that 8 inches of snow prevented Isaacs from attending. The Board did so with the intent of obstructing due process in both their own hearing and pending federal litigation.

241.    The NH Board's only training facility is operated by Dartmouth, the only academic medical center in New Hampshire. Dartmouth has a liaison physician to the Board, and the Board consists largely of accredited physicians. As such, despite being held under the auspices of a state entity, the Board as defined by its individuals has a close personal and economic nexus to Dartmouth; it cannot administer training licenses without the existence of Dartmouth .

## III.    Keck School of Medicine and John or Jane Doe

242.    Keck was the origination of the enterprise to retaliate against Dr. Isaacs as a witness of a federal crime (improper NIH influence on Keck).

243.    Keck engaged in multiple predicate acts, which were the subject of a federal lawsuit in 2007. The Plaintiff settled (civil claims) against Keck via the two aforementioned settlement agreements.

244.    Nonetheless, John or Jane Doe followed him, over a span of some five years, and disclosed the sealed records to Dartmouth. Based upon information and belief, John or

Jane Doe necessarily had connections with Defendant Keck, given their knowledge of the sealed records.

245.     In any event, the New Hampshire Board of Medicine determined that Keck breached the settlement agreement, as they never retracted "administrative charges" against Isaacs, including a charge of not demonstrating "Essential Characteristics" that lead to his suspension, and later, separation from the university.

246.     As such, Keck has violated anti-retaliation and wire and mail fraud provisions, with predicate acts spanning over a decade. Specifically, they continue to issue false transcript reports via wire and mail. Keck has had knowledge of Plaintiff's continued legal struggles to practice medicine. Keck could have easily intervened and clarified that the records had been sealed, annulled, and discharged. When they could have so easily helped conclude a decade of litigation in over a dozen venues, Keck's inaction alone evidences continued intent to retaliate.

247.     Upon information and belief the exact dates and times that these transmissions have been made can be garnered in discovery, the fact that these transmissions have been made is indisputable as the effects of these transmissions is clear.

248.     To the extent Keck counsel has recently, as of July 2019, disavowed the effect of their settlement and their obligations therein, they are promoting an open-ended threat. They assert, in perpetuity, that they will not mitigate any breaches, past or present, of the settlement agreement, leaving Plaintiff with a constant threat and fear of harm. Furthermore, they have repeatedly threatened Plaintiff with "liquidated damages" and Rule 11 sanctions (meritless threats in 2008 and 2019), further violating RICO and California 425.16, for speaking out and seeking to enforce the settlements.

249.     Keck furthermore encouraged Isaacs to sign a settlement that precludes his application to their GME programs in perpetuity. As an arbiter and gatekeeper to federally funded residency, Keck encouraged a permanent, open-ended block depriving Plaintiff access to their taxpayer funded program.

250.     The purpose of Keck's acts against Isaacs is the same as the other defendants, to make sure that Dr. Isaacs is and was unable to reach his goal of becoming a Doctor, in retaliation for law enforcement referrals he brought against them.

251.     RICO concerns "long term criminal conduct," which has existed here since Katsufrakis began to operate an enterprise meant to thwart Plaintiff's federal claims of abuse of power, admissions corruption involving the NIH, and extended via John Doe, under Keck's responsibilit, well into the next decade. Furthermore, Operation Varsity Blues underscores this event, and related events, were hardly isolated and represent a decades long "way of doing business." Indeed, with the termination of three consecutive Keck deans, literally a decade of MD students at Keck can no longer seek references, research projects, recommendations, etc from their discredited Deans.

252.     These Defendants, all involved in RICO violations, progress an enterprise whose primary focus was to assassinate Dr. Isaacs's medical career, through harsh, wrongful discipline at Keck, Dartmouth and later at the New Hampshire Board of Medicine. Generally, there is one unifying explanation for Plaintiff's fourteen year predicament: 1) in 2006, he reported activity concerning the improper NIH/Keck relationship, 2) such report included notice of federal litigation, 3) as a federal witness, and party to an official proceeding, Plaintiff should have been protected from retaliation, however 4) clearly Plaintiff has suffered an extensive retaliation that ended his medical career for being a

party to said proceeding. The entire retaliation originated with an attempt to discredit him, then a promising medical student, from bringing claims against several of the most senior physicians in California and even the nation. Forced to go "offshore," he completed his medical training and again resumed a promising path, based on his top ranking medical school achievement and national boards. John or Jane Doe transmitted the sealed Keck records to Dartmouth, which Dartmouth does not dispute, and the predicate act pattern of revenging the perceived litigious medical student resumed.

253.     As the result of these actions Dr. Isaacs has suffered financial loss including but not limited to: the tuition he paid to Keck, the stipend he lost at Dartmouth and the inherent value of a GME residency.

254.     These actors are all senior members of the medical profession and used their position in order to hide their intentions and use the courts and board of medicine to make sure that Dr. Isaacs can never practice medicine again. Particularly reprehensible is how Defendants, over more than a decade, used their status within venerable institutions to discredit Plaintiff and deny him any semblance of due process. Defendants planned to continue said mistreatment in perpetuity, forever denying Isaacs a medical career; it only appears questions raised at least one branch of the United States government finally checked Defendants' abuse of power. Punitive damages and/or substantial criminal penalties are particularly appropriate under RICO law.

255.     In addition to Plaintiff, it is expected that discovery in this case, and/or Operation Varsity Blues, will reveal a systemic retaliation against individuals, including students, who protested and sought to reveal improper admissions activity and similar administrative corruption.

256.     This behavior is particularly nefarious when one considers all of the effort it took Isaacs to pursue his singular goal of being a doctor. He worked diligently to help others as a student physician, with the understanding that his settlement agreements would protect him and allow him to move on with his life.

257.     These Defendants, through criminal enterprise, thwarted for good Dr. Isaacs's pursuit of being a medical Doctor and need to be held accountable for their crimes. The Defendants wrongful acts directly deprived Plaintiff the value of 1) three years GME salary stipend no less than $150,000, 2) an inherent knowledge and credential value of residency that far exceeds the government's cost/reimbursement to Dartmouth of approximately $1million, 3) a year tuition at USC Keck, 4) costs for medical care, and 5) future earnings of an MD/MBA that amount to at least $4 million, 6) the property value of his tuition and student loan payments for his medical degree, amounting to $400,000 and 7) though this is presently not a *qui tam* action, a loss to the federal medicare health system of a skilled physician a value that exceeds items 1 through 5 inclusive, including $200,000 in training subsidies to Dartmouth.

## COUNT VIII
### Retaliation
### (USC Keck)

258.     Plaintiff repeats and re-alleges each and every allegation contained herein as if fully stated under this count.

259.     In this District in 2006, Plaintiff filed claims against Defendant USC pursuant to 29 U.S.C. § 701 and 42 U.S.C. § 12101 and related acts.

260.     The aforementioned claims qualify as protected acts under their respective anti-retaliation statutes.

261.    In 2019, USC Counsel refused a request to "comply with the original settlement by correcting appropriate records and 2) help reinstate Plaintiff's GME training that was prematurely ended as a result of said breach."

262.    USC Counsel further took the position that two heavily negotiated settlement agreements simply didn't exist. They disavowed responsibility for sealing records, discharging administrative claims, acquitting claims, and annulling enrollment contracts. Evidence of this position is found in USC Counsel's statement that "USC did not "cause" Plaintiff's omission [of sealed and acquitted charges]. Had they accepted the validity of the settlement agreements, of course they would not hold Plaintiff responsible for their own breach.

263.    Keck took these actions due to the Plaintiff's previous suit against them and in unlawful retaliation against him.

264.    But for Plaintiff's civil and criminal charges against Defendant USC, Keck would not have breached their settlement. The breach was in retaliation against Plaintiff's claims.

<u>**Count IX**</u>
<u>**Section 1983**</u>
**(NH Board)**

265.    Plaintiff repeats and re-alleges each and every allegation contained herein as if fully stated under this count.

266.    Section 1983 prevents an individual, acting under the color or state law, from violating Plaintiff's constitutional rights.

267.     Here, the NH Board chose to "reprimand" Plaintiff for complying and accepting the terms of a federal court ordered settlement, by maliciously and deviously publishing the very same allegations against Plaintiff that had been sealed.

268.     The NH Board thereby interfered with a federal court ordered settlement agreement.

269.     The matter originated with a charge of "not maintaining Essential Characteristics," which the purported victim asserted a punishment of a one-semester suspension "didn't set right in [her] stomach."

270.     A decade after Keck acquitted and sealed the charge, the Board nonetheless forged ahead with a reprimand to publicly shame the Plaintiff and permanently ended his medical career (and other potential careers) citing false and unsubstantiated "stalking." This is excessive, pursuant to the language of the law of this claim. Plaintiff had no jury trial for supposed criminal stalking, but was reprimanded by a state agency and his medical career and reputation was assassinated.

271.     The reprimand violates Plaintiff's Eighth Amendment rights, as it is a particularly illogical and harsh reprimand, which defeats decades of successful academic studies and substantially and permanently impairs Plaintiff's ability to contribute meaningfully to society.

272.     There exists no public or state interest argument. The Board had every right, as is common in State Bar association applications, to ask if Plaintiff had ever had an expungement, sealed record, and/or factual innocence legal determination. Rather than address their own shortcomings and incompetency in their application, they decided to

dole out the harshest of punishments to Plaintiff, who was merely trying to practice medicine.

273.     The Board successfully dismissed Plaintiff's Section 1983 Due Process claim this year, which is still under certiorari review at the Supreme Court. The Board argued Plaintiff had "no clearly established right" to due process and exonerating evidence admission to their hearing. A motion to amend was disallowed, and hence, this Eighth Amendment claim could not be amended. For this reason, Plaintiff respectfully requests that this Section 1983 Eighth Amendment be allowed to proceed in the interest of justice and preference for merit based adjudication.


## COUNT X
## CONSTRUCTIVE FRAUD
### (USC Keck)

274.     Plaintiff repeats and re-alleges each and every allegation contained herein as if fully stated under this count.

275.     Under California Code 1573, Constructive fraud consists 1. In any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or any one claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him; or, 2. In any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud.

276.     In this alternative claim, should Plaintiff's prior claims not succeed, it is apparent his settlement agreements with Keck would have been formed out of constructive fraud.

277.     The only consideration Plaintiff received in the Individual Settlement was that of "factual innocence."

278.     Keck would have gained an advantage in settling the case, if no consideration was afforded to Plaintiff in his settlement agreement(s).

279.     Keck had a duty to engage in a good faith "meeting of the minds" in forming two complex settlement contracts. Experts in education and medical training, Keck had a particular negotiation advantage in understanding the entire ramification of the settlement terms, and had a duty not to mislead Plaintiff, lead him on, coerce him, or misrepresent facts and/or intents of the parties.

280.     In short, Keck breached their duty in issuing a proposed settlement, and signing it, in which they knew Plaintiff would not be granted the consideration he believed he would receive.

281.     An appropriate remedy would be re-opening of the claims and facts, pre-2008, that had been subject to settlement , and/or allocation of damages. Public interest warrants re-opening of this case in particular, specifically, there exists a real public concern regarding USC's inability to curtail abuses of power and bribery. Ongoing federal and state investigations have revealed a disturbing incidence at USC & Keck confirming a pattern of existence of both of Plaintiff's original claims, i.e. abuse of power and bribery.

WHEREFORE, The Plaintiff respectfully requests that this Honorable Court:

A. Order damages in excess of $18,000,000 under the jurisdictional authority of this Court;

B. Award triple damages, under the so-called private attorney general provisions of RICO, costs and attorneys' fees;

C. Await the United States Attorney as a criminal prosecutor for RICO criminal violations,

D. Permit discovery of RICO civil and criminal claims to proceed pending appointment of the United States as party;

E. A permanent injunction under USC 28 Section 1331 and/or Bivens restraining Defendant's Program Directors from blocking access to federal GME training and violating Plaintiff's Due Process rights;

F. A permanent injunction restraining the NH Board from issuing a false order, on the internet and national medical clearinghouse databases, that interferes with a federal court ordered settlement agreement.

G. Grant any further relief as may be fair and just under the All Writs Act.

## JURY DEMAND

The Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: July 21, 2019

Respectfully submitted,


/s/ Jeffrey Isaacs

Dr. Jeffrey Isaacs (*pro se*)

3553 West Chester Pk #177

Newtown Square, PA 19073

(212) 257-0737

jeffreydi@gmail.com