# Affidavit of Dr Jeffrey Isaacs

On April 11, 2007 I participated in a telephone Rule 26(f) Meet & Confer with USC outside counsel Robin Dal Soglio and Susan Christopher regarding case cv-06-3338. (Amended Complaint Exhibits, page 1)

We discussed settlement options. I offered to dismiss the individual defendants upon USC's agreement to seal my disciplinary files, i.e., my suspension/expulsion from Keck, in exchange for dropping any and all claims against the individuals, namely, Deans Peter Katsufrakis and Brian Henderson. (*Id.*)

This was a discussed as an equal exchange, so to speak, with no consideration assigned to me other than the sealing of the records.

Around June 25 2007 I filed a Third Amended Complaint which included, for the first time in public, the email tracking evidence (*Id*. at 3-6) which showed communication between the NIH headquarters and Senior Dean Henderson. Within several days, USC Counsel Dal Soglio threatened sanctions against me for filing this. (*Id*. at 2)

In my opinion, this entire decade long situation largely exists because of these NIH email receipts. I believe it showed improper communication between the student's father at NIH and the Keck deans. It supported the student's statement that she "got into Keck through connections." When I first saw the IP tracked communications between NIH and ZNI-100 (Zilkha Neuroscience Institute at USC), I sent a cease & desist letter to the student, with a United States District Court pleading cover, demanding any individual at Zilkha halt communications with NIH HQ about me. I assumed her father knew a scientist at Zilkha. Some weeks later, for reasons I do not recall beyond curiosity, I went to the Zilkha building . The entryway was labeled "Room 100" and had empty boxes and a notice that the room had belonged to Brian Henderson MD, but that he was now located in the main Keck Administration Building. He had recently been promoted Senior Dean of Keck after securing major funding for the ZNI facility. I panicked and believe I called my parents and explained that the unknown person speaking with NIH was , in fact, the Dean of my med school. The next day I went to Associate Dean Clive Taylor's office. He was the Dean who managed the upcoming hearing I was scheduled to attend regarding discipline. He reported to Henderson, and Katsufrakis reported to him. He was a British physician who had 'written the book' on Pathology. I was hopeful as I perceived him as a serious and unbiased scientist who might be able to resolve the

conflict. We sat down and discussed the situation for several minutes. I recall saying, exact words, "I'm being kicked out for accidently blackmailing the Dean," to which he nervously smiled and said, exact words "Sometimes in life you get a raw deal." I showed him the prescription medicine I was taking for a head injury, and told him my belief that this had all tragically gone too far. I asked him to intervene and remedy.

On July 3 2007, Keck agreed to a "sealing [of my] KSOM disciplinary records in exchange for a complete dismissal" of the Deans. (*Id*. at 7) Discussion of a monetary amount around $100,000, or a year medical school costs & tuition, to settle the remaining claims against the University ensued at this time.

On July 11 2007, I affirmed that "By completely sealing and clearing my record at USC, your client will be removing any burden on me to disclose these events in future career endeavors. I believe the makes everyone better off. I have been fortunate enough to receive a second chance; to pursue this opportunity is only possible with both the financial liquidity and the clear record provided by this settlement." (*Id*. at 8)

To the best of my knowledge, there did not exist at that time, and there still does not exist, statutory authority regarding educational sealing of records. However, there was no ambiguity whatsoever in our initial conversation and subsequent emails that USC would "remove any burden" on me to disclose the discipline. Under the respective California Code 851.8, sealing of records implies exoneration and "factual innocence." There is no doubt in my mind that our discussions and contractual intent on the 26(f) call likewise called for exoneration and factual innocence, with respect to the actions USC would take to clear the record. I am not aware of any law in any United States jurisdiction that prohibits a university from contracting with a student to seal and annul a charge.

USC Counsel sent me the proposed settlement for individual defendants, in exchange for sealing of disciplinary records, on July 17 2007. (*Id*. at 9)

USC rejected the monetary settlement of the one year tuition I had offered. Around the same time, I flew to Singapore to enroll at the new Duke – NUS MD program in August 2007. This would have cost me another year of delay, being the third time I started a MD program, and another year tuition beyond the two years I had spent on Keck in 2005 and the Caribbean University in 2006. (*Id*. at 11)

I therefore accepted the Individual Settlement agreement on September 4 2007, and relied heavily on it in making my subsequent medical career decision. I decided I did not have enough money to attend Duke, but as a result of my cleared record at USC, I could finish my medical degree at the Caribbean University and pursue my goal of practicing medicine.

Discovery and ADR requirements began in cv-06-3338 shortly thereafter. I sought the assistance of an attorney experienced with federal litigation , Michael Payne, to assist in mediating the remaining claims. (*Id*. at 12)

On October 31 2007 Michael Payne discussed settlement with USC Counsel Dal Soglio. He indicated we were seeking tuition refund and an expungement of my admission record. The main concern was that, although I had been cleared of the discipline, the fact I had enrolled at Keck remained, and would be awkward to explain on an application why I left Keck for a Caribbean med school. Nonetheless, an enrollment at Keck wasn't , per se, anything to be ashamed of , and this was a relatively minor point , we believed, in the negotiation to settlement. As an alternative to "expungement and tuition refund," we also offer a retroactive "voluntary withdrawal" as an acceptable alternative. (*Id*. at 15)

We didn't hear back until January 8 2008, when USC Counsel stated they could not "expunge a record[of admission]," but could "change the record to reflect a voluntary withdrawal." (*Id*. at 20)

On January 29, 2008, USC Counsel Dal Soglio reneged on her previous offer to permit a voluntary withdrawal, stating that USC determined "it is not able to alter school records." (*Id*. at 21)  She then seemed to downplay the prior settlement, which sealed and cleared my record, as merely "not releasing information," which is a statutory FERPA requirement and certainly not what the original settlement bargained for. I believe her statement that USC was "not able to alter school records" was false and contradicted the prior settlement agreement. The prior settlement altered school disciplinary records. USC agreed not to release my sealed disciplinary records without a court order. But USC has statutory requirements, under FERPA and other law, to release disciplinary records to interested parties without court order. This logically and implicitly follows that the disciplinary records had been cleared, sealed, expunged and/or exonerated, which amounts to alteration of records. If Keck had not altered the records, Keck would be in violation of FERPA and other rules that require disclosure without court order. Moreover, the clear meaning and intent of the agreement was "factual innocence" and "complete sealing and clearing" of the discipline.

On January 30 2008, Michael Payne exited the negotiations and informed Dal Soglio he believed her settlement negotiation tactics had been "unprofessional." He stated that I had been justified in my earlier concerns that Dal Soglio was simply riding out the discovery clock in bad-faith settlement discussions. (*Id*. at 23)

In February 2008 I resumed the remaining minimal discovery with Counsel Dal Soglio. I also attempted to resume settlement discussions. I needed to study for the USMLE national medical boards between May and August 2008 (which I did successfully and earned a top 99 score). I realized I faced an uphill battle of trying to conduct discovery pro se, moreover after the clock had been run out, or reach a settlement and move on with my life. The sticking point in negotiations seemed to be, largely, that USC didn't want to issue any significant monetary payment, but I sought a tuition refund to expunge my enrollment at Keck. On March 14, I offered USC to settle at a "tuition refund, less administrative charges." In other words, if USC merely said they had refunded my tuition, I would allow them to subtract legal costs and refund a relatively petty amount. (*Id*. at 25)

I requested a teleconference from the Caribbean with Dal Soglio on March 20, 2008 to discuss the urgent situation with discovery and settlement. (*Id*. at 27) In the conference, which took place at 2:00PM EST, I asked her about the discrepancy of USC who had already cleared and exonerated me, not being willing to modify records. Her explanation, as best as I recall, was as follows: her client (Katsufrakis primarily, and Ball/Henderson) viewed me as a liability and uncertainty in the future, as I would be reentering the medical system and be around people who may take issue with this. As a result, they didn't want to issue anything on "USC letterhead" indicating "Voluntary Withdrawal," but wanted to "keep options open," with the idea that if I "kept my head low and had no future allegations, my "medical career would continue un-impended." Nonetheless, she believed a broad settlement that was "preferentially vague" may allow both parties to walk away with what they needed. Specifically, the language of a waiver and release, if drafted with care, should eliminate any remaining concerns on my behalf regarding future disclosure. I had the general impression she knew additional information about my claims, and knew that I had been wronged. It seemed she genuinely wanted to help settle the matter and allow me to move on. After the call, at 5PM I 'confided' additional information to her about her client, taken from Attorney Payne's notes a year earlier:

> *"I felt that this whole ordeal gave Katsufrakis some form of perverse pleasure. He seemed to take an interest in me that went above and beyond that of Deans I have previously interacted with at other schools. In our meeting, Katsufrakis would frequently look strangely at my clothes, my shoes, etc and treat me in an odd manner. He commented on my clothes and "sophisticated" style of dress, and made comments that could be construed as improper advances. There were always double-entendres; he asked me how I felt being "caught with my pants down" in reference to the behavior I attribute as a reaction to harassment from others, and my disability. I believe his handling of the entire manner had ill intentions. To make matters worse, he knew that I was afraid of the NIH involvement and played on my fears. He took advantage of this fact."* (*Id*. at 30)

On March 31 2008 around 1PM, USC Counsel Dal Soglio emailed me a draft global settlement. (Id. at 36) As discussed by telephone, broad terms were employed that satisfied my remaining concerns about enrollment disclosure. The release terms "As a material inducement to Isaacs to enter into this Agreement, USC does hereby irrevocably and unconditionally release, acquit, and forever discharge Isaacs from any charges, complaints, claims, liabilities, obligations, promises & agreements[contracts] … of any nature whatsoever, known or unknown." This agreement acquitted me of any allegations/claims, and discharges and administrative charges, including "failing to maintain essential characteristics." Moreover, it discharged and annulled any contracts, including the enrollment contract. These beliefs are based on the plain text interpretation, which is what USC Counsel told me to look for during the prior phone call. I was pleased with the agreement and believe a meeting of the minds had occurred based on our telephone conversation the week before. It occurred to me, though I have no way of confirming this, that Dal Soglio felt I deserved a new start, and was able to get the settlement approved, after two years of roadblocks, by placing the necessary language in what appeared to be standard boilerplate release terms. Except, it wasn't. It specifically alluded to that cancellation of contracts and dismissal of administration charges discussions that had preceded the formation of the contract for eighteen months.

I had one concern with the draft, specifically, language that required me to say "The matter has been resolved" if asked about USC or related history, ie, enrollment. I emailed this concern to Dal Soglio. At 3:44PM she confirmed it "re-opens the issue of your desire to have USC advise you on what you do or do not have to disclose to

third parties about your academic and disciplinary history at USC." At 5:20PM I replied that I "didn't see how it creates a problem" to concede the case was settled "before trial on merits, and as such, that I don't need to disclose anything about any related [enrollment] history." Believing we were on the same page and close to settlement, I suggested enthusiastically that she send the final settlement agreement that I would "SIGN AND RETURN" immediately. At 7PM, she sent the final PDF, with the language added "The parties further agree that Isaacs is not required to disclose this matter to anyone." I accepted the settlement at that point. (*Id*. at 31-37)

The CACD court enforced the settlement, as there was concern it superceded and invalidated the Individual Settlement agreement, which Keck claimed it did not. From that point forward, I tried to move forward and put USC behind me. As stated above, I received a top decile score on the USMLE exam I took in August 2008, which to me reinforced I had made the correct decision to settle the case in April 2008 and focus on my medical studies.

In February 2012, a Skadden Arbs attorney who was also my roommate in college emailed me about the settlement. He said that he believed "USC – expert in medical training standards – threw down a spike that they knew was going to be a long term impediment. "I disagreed with his interpretation, and until 2015, I had no reason to believe USC did not uphold their end of the bargain. (*Id*. at 63)

In April 2012 the American Academy of Medical Colleges investigated my non-disclosure of Keck on my residency application . I provided them copies of the two settlement agreements, and asked them to seal their investigation, as leaving it public would defeat the purpose of the settlement agreements and harm my medical career. They agreed that my "request is reasonable" and in May 2012 the AAMC expunged their investigation of my residency application. (*Id*. at 46)

In June 2012, a tribunal was held at the New Hampshire Employment Security office regarding my non-disclosure of USC on an application to Dartmouth. Dartmouth's Program Director Finn testified at the NHES tribunal that I was "dishonest" and "misrepresented the truth" when I answered "No" to an application question "Was I ever disciplined in any activities involving medical education?" However, the NHES tribunal Chairperson determined that my reliance on the Keck Settlement Agreements was appropriate and served as a sufficient reason to not disclose USC on my application. (*Id*. at 48-49)

In February 2014 Dartmouth's designated officer (Finn) testified regarding her 2012 termination of my enrollment in residency for not disclosing USC. Finn testified

she did not "know the specifics of the law that governs" sealed academic records. She testified "She did not have the full legal knowledge to interpret them," and that they were "a little confusing." Finn had previously testified at NHES that Keck non-disclosure was the primary reason I had been terminated from residency. She testified that "if a competent authority such as ERAS had determined Keck did not need to be listed, [she] would accept ERAS's qualification." Despite this testimony agreeing to yield to ERAS/AAMC's legal interpretation, Dartmouth has never retracted their termination. (*Id*. at 52-64)

In March 2014 the New Hampshire Board of Medicine disciplined me for failing to disclose the USC discipline and enrollment to them on my license application. They determined, incorrectly, that there was "no provision sealing the records." That was patently false, as were numerous other mistakes in their order. They did however declare that upon reviewing my academic records from USC, they found no evidence that USC ever dismissed my expulsion from the record. The Board also stated that no law required it to accept factual innocence of a sealed record (citing NH RSA 651, similar in scope to CA 851.8) of administrative charges. They disciplined me for USC's breach and failure to dismiss appropriate charges. I appealed the order to the NH Supreme Court, and ultimately, the US Supreme Court, believing it was simply erroneous. However, neither the appeal nor the certiorari petition succeeded. (*Id*. at 55-62)

Hence, in June 2015 , as a matter of law, there existed a legal determination by a competent authority that declared USC breached their contract. At that time there also existed conflicting legal determinations on the meaning, interpretation, and effects of the two Keck Settlement Agreements.

In April 2019 I retained attorney Keith Mathews engage in ADR with Keck, to remedy any breach of the settlements and assist me in resuming federally funded residency training. We genuinely thought Keck/USC might be sympathetic to the decade long plight I faced during residency training which resulted from an "intentionally vague" settlement agreement. Keck, via Counsel Andreas Meyer, delayed three months in answering our mediation requests, using similar delay tactics Counsel Dal Soglio had used. He replied, tersely, that USC "declines" to discuss resolution / mitigation of the breach in ADR or otherwise, or to assist me in resuming residency training. (*Id*. at 41-44) Meyer has therefore refused to correct any negligent breach; in other words, Meyer has intentionally breached our two settlements.

Likewise USC Counsel Fogelman further asserted in June 2019, in a MTD pleading, that "USC did not "cause" Plaintiff's intentional omissions. [of not disclosing Keck expulsion or enrollment]. USC, as discussed above, undertook a settlement with me to dismiss the individual defendants from disclosure liability, in exchange for eliminating any burden for me to disclose the sealed disciplinary events. USC Counsel now acts as if these settlements, which took collectively two years to arrive at, simply don't exist. By defending Dartmouth and the NH Board, and pinning blame on me for relying on the settlements, Fogelman has breached the settlements by falsely and publicly disavowing their intent and purpose.

Based on the aforementioned information, In June 2015 I was alerted to a possible negligent breach by Keck, and had no reason to believe it was intentional. However, Counsel Meyer and Fogelman's recent statements can only mean that Keck is intentionally breaching their end of the bargain.

I hereby declare that this affidavit is true and correct to the best of my knowledge and belief. All exhibits attached are true and correct copies.

/s/ Jeffrey Isaacs

Dr Jeffrey Isaacs
July 21 2019
Plaintiff